UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

EAST GUARDIAN SPC

                       Plaintiff,

        - against -

EINER ENERGY SÁRL;
NORTH SEA BIODIESEL A/S; ARIE MAZUR;
AND CONSTANTIN LUTSENKO

                       Defendants.

-----------------------------------------------------------------x

Index No: **1:15-cv-09051**

**COMPLAINT**

Name of Judge:

Plaintiff, EAST GUARDIAN SPC (**"EG"**), for its complaint against Defendants EINER ENERGY SÁRL; NORTH SEA BIODIESEL A/S; ARIE MAZUR; and CONSTANTIN LUTSENKO, hereby alleges:

1.    EG commences this action pursuant to the Uniform Foreign Country Money Judgments Recognition Act (**"UFCMJRA"**), as codified in Article 53 of New York Civil Practice Law and Rules (**"CPLR"**), for the recognition and enforcement of a foreign money judgment in the amount of USD $25,235,674 and GBP £115,737.47, plus interest and costs of collection, representing sums due under a foreign money Judgment dated October 7, 2015 (and sealed on October 9, 2015) and entered by the High Courts of Justice of England and Wales, Queen's Bench Division, Commercial Court, against defendants, EINER ENERGY SARL, NORTH SEA BIODIESEL A/S, ARIE MAZUR AND CONSTANTIN LUTSENKO, for which Plaintiff seeks recognition.

2.    A copy of the UK Order is annexed hereto as Exhibit "A."

## **The Parties**

3.    The Plaintiff at all relevant times was and is a company incorporated under the laws of the Cayman Islands, consisting of private portfolio investment funds that

invest in securities real estate and private equity and also provide debt financing to trading companies.

4.      The First Defendant is a Luxembourg Limited Liability Company with registration number B154463, with its registered address at 1B Heienhaff, L-1736, Senningerberg, Luxembourg.

5.      The Second Defendant is a Norwegian private limited company, registered with the Norwegian Ministry of Enterprises under registration number 990 154 848 with its registered office at Oraveien 2, 1630 Gamle Fredrikstad, Norway. The Second Defendant was formerly known as Uniol AS and was owned by, and was a subsidiary of, the First Defendant.

6.      The Third Defendant is a Canadian national, a beneficial owner of shares in the First Defendant, indirectly a beneficial owner of the Second Defendant, and the business partner of the Fourth Defendant.

7.      The Fourth Defendant is a national of the United States of America, who resided in Moscow, Russian Federation at the time of the underlying action. Mr Lutsenko is a beneficial owner of shares in the First Defendant and indirectly a beneficial owner of the Second Defendant.  Upon information and belief Mr Lutsenko presently resides in New York.

## Jurisdiction and Venue

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is diversity of citizenship between the parties and the amount in controversy exclusive of interest and costs exceeds $75,000.

9.      No personal jurisdiction is required for the domestication of foreign money judgments such as the UK Order pursuant to CPLR Article 53.  *See gen.* CPLR § 5303; *Thomas and Agnes Carvel Foundation v. Carvel*, 736 F. Supp. 2d 754-55 (S.D.N.Y. 2010) ("New York courts need not have personal jurisdiction over a litigant to recognize a foreign judgment over her…."); *Ocean Warehouse B.V. v. Baron Metal and Alloys, Inc.*, 157 F. Supp. 2d 245, 252 (S.D.N.Y. 2001) (same).

10.     Venue is proper in this district pursuant to 28 USC § 1391(b)(2) and (b)(3) because a substantial part of the events giving rise to this claim occurred in this district and because the Fourth Defendant is believed to reside in this district.

## Background Facts

11.     Further detail in regard to the underlying dispute between the parties and the procedural history of proceedings taken by the Plaintiff in England is contained in the witness statement of Yisroel Hiller dated 5 August 2015 and the attached exhibit. A copy of this statement and its exhibit is annexed hereto as Exhibit "C."

12.     The UK Order was issued by the English Courts subsequent to the Plaintiff obtaining a Final Award in The London Court of International Arbitration (**"LCIA"**) Arbitration Number 142794, dated April 30, 2015. A true and correct copy of the LCIA Award is annexed hereto as Exhibit "B."

13.     The parties' dispute arose out of the Defendants' breach of loan agreements between the parties (the **"Loan Agreements"**) and the Defendants' failure to repay the loans which the Plaintiff issued between April 2013 and March 2014 to Einer Energy (First Defendant) and to its former subsidiary, North Sea Biodiesel (Second Defendant).

14.     The Third and Fourth Defendants each provided personal guarantees to the Plaintiff in connection with each of the loans issued by the Plaintiff to Einer and/or NSB in August 2013 and February 2014.

15.     The cumulative sum of these loans amounted to USD 30,000,000; capital of USD 21,000,000 and interest of USD 939,652 was due to be repaid on 23 August 2014. No repayments have been made and the loans are in default. The outstanding loan interest stands at USD 1,268,244.

16.     The Loan Agreements between the parties provided that any disputes in connection with the agreements would be referred to the LCIA for final determination by a single arbitrator.

17.     By its Request for Arbitration dated 23 September 2014, the Plaintiff commenced an arbitration against the Respondents in the LCIA. The LCIA confirmed

the seat of the arbitration as London, England and on 25 November 2014 appointed Mr Edwin Glasgow CBE QC as sole arbitrator to determine the dispute.

18.     A final hearing in the arbitration was held on 14 April 2015 at the International Dispute Resolution Centre in London. Following the final hearing the tribunal issued the LCIA Award.

19.     Before commencing the LCIA Arbitration, the Plaintiff had obtained worldwide freezing orders (**"WFO"**) from the English High Courts against the Third and Fourth Defendants by Order of Mr Justice Morgan dated 22 September 2014. Similar relief was obtained against the Third Respondent in Canada.

20.     Each of the Third and Fourth Defendants participated in the WFO proceedings before the English courts for a period of time, including by solicitors, and filed evidence supporting a challenge to the grant of the WFO on technical grounds.  Mr Justice Morgan considered and rejected that challenge at the return date hearing when he continued the WFO on 30 October 2014.   A true and correct copy of Mr Justice Morgan's Order is annexed hereto as Exhibit "D." The Canadian Courts rejected a similar challenge to the grant of relief in Canada by the Third Defendant.

21.     Upon receipt of the LCIA Award the Plaintiff filed an application in the English High Courts to have the LCIA Award entered and recognized as an English judgment and for leave to enforce the LCIA Award as a judgment outside the jurisdiction of the United Kingdom.

22.     On October 7, 2015, Mr Justice Teare of the Queen's Bench Division of the High Courts issued the UK Order.  The UK Order was duly sealed on October 9, 2015.

23.     Pursuant to the terms of the UK Order:

    a.    The First and Second Defendants were ordered to pay the Plaintiff the sum of USD 21,000,000 due and owing under the relevant loan agreements;

b.   The Third and Fourth Defendants were ordered to pay the sum of USD 21,000,000 to the Plaintiff by way of damages pursuant to their guarantees in respect of the capital sums owing under the loan agreements;

c.   The First and Second Defendants were ordered to pay the Plaintiff the sum of USD 4,235,674 by way of interest;

d.   The Third and Fourth Defendants were ordered to pay to the Claimant the sum of USD 4,235,674 by way of damages pursuant to their guarantees in regard to the said interest;

e.   The Defendants were ordered to jointly and severally pay the sum of £85,880.74 by way of the Plaintiff's legal and other costs and £29,856.73 by way of the costs of the arbitration.

### Request for Recognition of the UK Order Against the Defendants

24.   The Plaintiff respectfully requests that the UK Order be recognized as a local judgment pursuant to the UFMJRA as adopted and incorporated into the CPLR Article 53.

25.   Pursuant to CPLR § 5302 Courts applying New York law should grant judicial recognition to *"any judgment of a foreign state granting or denying recovery of a sum of money"* so long as the foreign judgment is final, conclusive and enforceable where rendered.

26.   Foreign judgments are deemed "conclusive" under New York law if the judgment is rendered under a system which provides impartial tribunals and procedures compatible with the due process of law and if the foreign court had personal jurisdiction over the defendant. CPLR § 5302.

27.   The UK Order is within the scope of the UFMJRA and CPLR Article 53 because: (i) it is final, conclusive and enforceable where rendered; (ii) it grants a sum of money; and (iii) it is not a judgment for taxes, fines, penalties or rendered in connection with domestic relations.  The time for the Defendants to appeal the UK Order has expired and no further appeals are possible.

28.    The UK Order also is not subject to any of the concerns set out in CPLR §
5304 and CPLR § 5305 because the English courts had personal jurisdiction over all
of the Defendants.

## COUNT I
## <u>RECONITION OF A FOREIGN JUDGMENT</u>

29.    Plaintiff EG repeats and incorporates by reference the preceding paragraphs as
if fully set forth herein.

30.    New York has a "long-standing" practice in recognizing and enforcing foreign
country money judgments." *V Corp Ltd. v. Redi Corp.,* No. 04 Civ. 1683 (MBM),
2004 U.S. Dist. LEXIS 20424, at *9, (S.D.N.Y. Oct. 7, 2004) (citing cases).

31.    The UK Order is a foreign judgment that qualifies for recognition and
enforcement under the UFMJRA, CPLR § 5301(b), in that it is a judgment of a
foreign state granting the recovery of a sum of money that is unrelated to a judgment
for taxes, fine or other penalty, or in support in a matrimonial or family matter.

32.    The UK Order is also final, conclusive and enforceable in England, where it
was rendered and should accordingly be recognized as a local judgment pursuant to
the UFMJRA and CPLR § 5302.  The time period for the Defendants to appeal the
UK Order has expired and no further appeals are possible.

33.    The UK Order also is not subject to any of the concerns set out in CPLR §
5304 and CPLR § 5305 because the English courts concluded, property, that they had
personal jurisdiction over all of the Defendants.

34.    The Defendants submitted to the jurisdiction of the English courts in regard to
this dispute via the forum selection clause in the Loan Agreements to which they were
a party.  The Third and Fourth Defendants also actively participated in the WFO
proceedings for some time including by instructing solicitors to act on their behalf and
by filing acknowledgments that they were served with, and intended to defend, the
proceedings.

35.    In any case, New York law does not require the Plaintiff to establish a basis
for this Court's personal jurisdiction over the Defendants.  *See, e.g.*, *Thomas and*

*Agnes Carvel Foundation v. Carvel*, 736 F. Supp. 2d 754-55 (S.D.N.Y. 2010) ("New York courts need not have personal jurisdiction over a litigant to recognize a foreign judgment over her….").

36.     Last, the UK Order was issued by the Queen's Bench Division of the High Courts in the United Kingdom, Courts which have long been recognized as consistent with New York's concept of due process and which provide impartial tribunals. *See, e.g., CIBC Mellon Trust Co. v. Mora Hotel Corp.,* 100 N.Y.2d 215; 762 N.Y.S.2d 5 (N.Y. 2004).

**WHEREFORE,** Plaintiff East Guardian SPC respectfully requests that this Court (i) recognize and permit enforcement of the UK Order in the amount of USD $25,235,674 and GBP £115,737.47; (ii) award the Plaintiff post-judgment statutory interest at 8% per annum accruing daily until the UK Order is paid in full by the Defendants; (iii) award Plaintiff its attorney's fees and costs of this action; and (iv) provide for such other relief as this Court may deem just and proper.

Dated:  New York, New York
           November 18, 2015

**ASSERSON HILLER PC**

By: *Yisroel Hiller*

Yisroel I. Hiller (YH 3343)
11 Broadway, Suite 615
New York, NY 10004
(212) 939-7585
*Attorneys for Plaintiff*
*East Guardian SPC*

# EXHIBIT "A"

Claim No.: CL-2015-000590

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

**IN THE MATTER OF THE ARBITRATION ACT 1996**
**IN THE MATTER OF AN ARBITRATION CLAIM**

MR JUSTICE TEARE

**B E T W E E N :**

**EAST GUARDIAN SPC**

**Applicant**

- and -

**(1) EINER ENERGY SÁRL**
**(2) NORTH SEA BIODIESEL A/S**
**(3) ARIE MAZUR**
**(4) CONSTANTIN LUTSENKO**

**Respondents**

---

**ORDER**

---

**UPON** the Claimant's application without notice by arbitration claim form dated 6 August 2015;

**AND UPON** reading the witness statement of Mr Yisroel Hiller dated 5 August 2015 and the enclosed exhibit YIH1.

**IT IS ORDERED THAT:**

1.  The Claimant has permission to serve the Arbitration Claim form out of the jurisdiction on the Respondents.

2.  The Claimant has leave to enforce the LCIA arbitration award dated 30 April 2015 appended to the Claim Form pursuant to section 66(1) of the Arbitration Act 1996.

3.  Judgment is hereby entered against the Respondents pursuant to section 66(2) of the Arbitration Act 1996 in terms of the said LCIA award, as follows:

    3.1. The First and Second Respondents shall pay to the Claimant the sum of USD 21,000,000 due and owing under the relevant loan agreements;

3.2. The Third and Fourth Respondents shall pay the sum of USD 21,000,000 by way of damages pursuant to their guarantees in respect of the capital sums owing under the loan agreements;

3.3. The First and Second Respondents shall pay to the Claimant the sum of USD 4,235,674 by way of interest;

3.4. The Third and Fourth Respondents shall pay to the Claimant the sum of USD 4,235,674 by way of damages pursuant to their guarantees in regard to the said interest;

3.5. The Respondents and each of them shall pay the sum of £85,880.74 by way of the Claimant's legal and other costs and £29,856.73 by way of the costs of the arbitration.

4. The costs of this application, including the costs of entering judgment, be paid by the Respondents; such costs to be summarily assessed if not agreed.

5. Within 22 days after service of the order, the Respondents may apply to set aside the order. The award must not be enforced until after the end of that period, or until any application made by the Respondents within that period has been finally disposed of

6. The Respondents have the following periods to acknowledge service of the arbitration claim form:

6.1. The First Respondent (Luxembourg): 21 days

6.2. The Second Respondent (Norway): 21 days

6.3. The Third Respondent (Canada): 22 days

6.4. The Fourth respondent (Russia): 21 days

Dated this 7 day of ~~August~~ October 2015

2

<u>IN THE HIGH COURT OF JUSTICE</u>
<u>QUEEN'S BENCH DIVISION</u>
<u>COMMERCIAL COURT</u>

<u>IN THE MATTER OF THE ARBITRATION ACT 1996</u>
<u>IN THE MATTER OF AN ARBITRATION CLAIM</u>

B E T W E E N:

**EAST GUARDIAN SPC**

<u>Applicant</u>

- and -

(1)  **ARIE MAZUR**
(2)  **CONSTANTIN LUTSENKO**
(3)  **EINER ENERGY SÁRL**
(4)  **NORTH SEA BIODIESEL A/S**

<u>Respondents</u>

---

**ORDER**
**ENFORCEMENT**
**OF LCIA AWARD**

---

Solicitors to the Claimant
**Asserson Law Offices**
UK address for service:

38 Wigmore Street
London
W1U 2RU Tel 020 3150 1300
Fax 020 3150 0391

3

# EXHIBIT "B"

LCIA Arbitration Number 142794

IN THE MATTER OF THE ARBITRATION ACT 1996

BETWEEN:

## EAST GUARDIAN SPC

Claimant

-and-

## ARIE MAZUR

First Respondent

## CONSTANTIN LUTSENKO

Second Respondent

## EINER ENERGY SARL

Third Respondent

## NORTH SEA BIODIESEL A/S

Fourth Respondent

---

## FINAL AWARD

---

## I.   INTRODUCTION

1. The Claimant in this arbitration is East Guardian SPC ("EG"), a segregated portfolio company established under the laws of the Cayman Islands with a registered address and headquarters at c/o Maples Corporates Services Ltd., PO Box 309, Ugland House, South Church Street, Grand Cayman KY1-1104, Cayman Islands.

2. The loans giving rise to the claim ("the EG Loans") were issued by a segregated portfolio managed by EG called the East Guardian Asset and Trade Finance Fund Segregated Portfolio (formerly the East Guardian Real Property Segregated Portfolio), albeit EG itself was a party to the EG Loans.

3. The Claimant's legal representatives, at all times and for all purposes material to these arbitral proceedings, have been and are Asserson Law Offices, at 38 Wigmore Street, London W1U 2RU, and their Counsel is and has been Justin Higgo, of Serle Court Chambers.

4. The Respondents in this arbitration are as follows:

   a. Arie Mazur, the First Respondent, is a Canadian national, a beneficial owner of shares in the Third Respondent, indirectly a beneficial owner of the Fourth Respondent, and the business partner of the Second Respondent.

   b. Constantin Lutsenko, the Second Respondent, is a national of the United States of America, currently resident in the Russian Federation, a beneficial owner of shares in the Third Respondent, indirectly a beneficial owner of the Fourth Respondent, and the business partner of the First Respondent.

   c. Einer Energy SARL, the Third Respondent, is a Luxembourg company with registration number B154463 with its registered address at 1B Heienhaff, L-1736, Senningerberg, Luxembourg.

   d. North Sea Biodiesel A/S, the Fourth Respondent, is a Norwegian private limited company, registered with the Norwegian Ministry of Enterprises under

registration number 990 154 848 with its registered office at Oraveien 2, 1630 Gamle Fredrikstad, Norway.   The Fourth Respondent was formerly known as Oniol AS.  At all material times the Fourth Respondent was wholly owned by the Third Respondent.

5.  The legal representatives of the Respondents in relation to these arbitral proceedings were at all material times and remain unknown.  None of the Respondents has taken any part in these arbitral proceedings.

## II.   JURISDICTION

6.  This Award in LCIA Arbitration No. 142794 is made in respect of claims ("the Claims") made by the Claimant in its Request for Arbitration, which Request was, in the circumstances set out below, permitted to be, and was in fact adopted as, the Claimant's Statement of Case. The Claims concern the Respondent's failure to pay sums owing to the Claimant, in breach of (i) a loan agreement dated 22 May 2013 between the Claimant and the Third Respondent (the "Second Loan Agreement"), (ii) an amended Second Loan Agreement dated 23 August 2013 (the "Increased Second Loan Agreement"), and (iii) a loan agreement dated 24 February 2014 (the "Third Loan Agreement"), pursuant to which loan agreements the Claimant had issued the EG Loans to the Third and Fourth Respondents between April 2013 and March 2014.  The First and Second Respondents, parties to the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement, provided personal guarantees for each of the loans issued by the Claimant to the Third and Fourth Respondents.

7.  Clause 21.1 of the Second Loan Agreement and the Increased Second Loan Agreement provided that:

> "This Agreement and all non-contractual obligations arising out of or in connection with it are governed by the laws of England and Wales without reference to its conflict of laws principles."

3

8.  Clause 22.2 of the Second Loan Agreement and the Increased Second Loan Agreement provided that:

> "*In the event of a dispute arising of or relating to this contract, including any question regarding its existence, validity or termination, the dispute shall be referred to an[d] finally resolved by arbitration under the LCIA rules, which rules are deemed to be incorporated by reference into this clause. The language to be used in the mediation and in the arbitration shall be English. The Arbitral Tribunal shall consist of one arbitrator who shall be an English Lawyer of at least ten years standing and be appointed by the LCIA. The Parties hereto hereby submit to the exclusive jurisdiction of the LCIA. Any judgment shall be final and binding upon the Parties as to the subject matter decided.*"

9.  Clauses 21.1 and 21.2 of the Third Loan Agreement were in identical terms to those set out in paragraphs 7 and 8 above.

## III.  PROCEDURAL HISTORY

10. The Claimant formally requested the commencement of this arbitration by its Request for Arbitration dated 23 September 2014 (the "Request").

11. In accordance with Article 1.1(g) of the Arbitration Rules of the London Court of International Arbitration 1998 (the "LCIA Rules"), copies of the Request, with the relevant exhibits, were sent to the Respondents and each of them by email, on 23 September 2014, and by courier, on 24 September 2014.

12. The Request was made at the same time as the Claimant's application dated 22 September 2014, for a worldwide freezing order ("WFO") against the First Respondent and the Second Respondent. A WFO was ordered by Mr Justice Morgan of the High Court against the First Respondent and the Second Respondent on 22 September 2014 and was sealed on 24 September 2014. On 30 October 2014, a final WFO was issued by Morgan J against the First Respondent and the Second Respondent.

13. After the WFO was issued, the Claimant commenced proceedings in the Superior Court of Ontario to enforce the WFO against the First Respondent there and for related orders to assist the Claimant in locating and freezing the First Respondent's assets in Canada. By reason of those proceedings, the Canadian courts made the following orders on the Claimant's behalf and against the First Respondent:

   a. A Mareva injunction, dated 13 November 2014, restraining the First Respondent dissipating his assets up to the value of USD 23,000,000;

   b. An Order, dated 13 November 2014, appointing a personal Receiver to investigate and collect the First Respondent's assets;

   c. An Order, dated 15 December 2014, widening the powers of the Receiver to investigate and identify the First Respondent's assets; and

   d. An Anton Piller Order, dated 2 December 2014, allowing entry to and the search of the First Respondent's premises and the seizure of relevant evidence therefrom.

14. None of the Respondents filed any Response to the Claimant's Request within the time limit prescribed by Article 2 of the LCIA Rules, or at all.

15. By email dated 24 November 2014, after the LCIA had invited comment from the parties as the seat of the arbitration, the parties were informed that the LCIA Court had determined that, consistent with the terms of the Agreements between all the parties, the seat of the arbitration was London.

16. On 25 November 2014, the parties were notified by email of the appointment of the Tribunal, Mr Edwin Glasgow QC of 39 Essex Chambers, London. Mr Stephen Kosmin of 39 Essex Chambers, London, was appointed as Secretary to the Tribunal on 23 December 2014, with the consent of the Claimant and in the absence of dissent from any of the Respondents. Those appointments having been accepted, the Arbitral Tribunal was duly established in accordance with the provisions of the Agreements and the LCIA Rules as having jurisdiction in respect of the Claims.

17. On 10 December 2014 the Claimant wrote to inform the LCIA that it elected to treat its Request as its Statement of Case, in accordance with Article 15 of the LCIA Rules.

18. On 23 December 2014, the Tribunal issued Directions, including confirmation of the fact that the Request for Arbitration had been duly served in accordance with the LCIA Rules, by the Claimant on the First, Second, Third and Fourth Respondents and directing that the Respondents deliver their Statement of Defence and any Statement of Cross Claim by 4pm on 7 January 2015.

19. On 23 October 2014, the deadline under Article 2.1 of the LCIA Rules for the Respondents to put in a Response to the Request expired.

20. By email dated 3 November 2014, the LCIA confirmed that it had not received a Response from any of the Respondents.

21. On 23 January 2015, no Response or Statement of Defence having been served by any of the Respondents, the Tribunal issued Procedural Order No.1 fixing directions through to the hearing and providing that such hearing was to take place in London on the first available date after 16 March 2015.

22. On 13 February 2015 and in accordance with Procedural Order No. 1, the Claimant submitted the evidence upon which it intended to rely at the hearing, namely a witness statement of Mr Yisroel Hiller and a witness statement of Mr Erik Wigertz, both statements being dated 13 February 2015.

23. On 3 March 2015, the Tribunal issued Procedural Order No. 2. Procedural Order No. 2 recorded, *inter alia,* that the Claimant had agreed to the Tribunal's request that it correspond with a Canadian lawyer who was known to have acted for the First Respondent in court proceedings in Canada, in order to see whether he was prepared to assist the Tribunal by accepting service on behalf of the First Respondent or by providing an address for service; however, the Claimant was informed prior to the hearing that the First Respondent's Canadian lawyer was no longer instructed by the First Respondent.

6

## IV.   <u>THE HEARING</u>

24. On 14 April 2015, the hearing took place at the International Dispute Resolution Centre in London.

25. At the hearing, the Claimant was represented by Mr Justin Higgo.   None of the Respondents attended the hearing and none was represented at it.   It was, however, submitted on behalf of the Claimant that the Tribunal should take particular note of the following matters in relation to the WFO proceedings referred to at paragraph 12 above:

   (i)  The First and Second Respondents had been represented by the well known international law firm, Charles Russell (now Charles Russell Speechlys LLP) in the course of the WFO proceedings;

   (ii)  The WFO proceedings were issued and determined in the context of these arbitral proceedings also being extant at that time;

   (iii) While purporting to reserve their positions in respect of the jurisdiction of the English court in relation to those proceedings, and while denying that the Claimant was entitled to the relief sought (and ultimately granted) in those court proceedings, the evidence served on behalf of the First and Second Respondents in those proceedings had not sought to deny that any of the material loans had been made, or that the sums claimed by way of debt and interest were not due, or that the guarantees had not been given.

26. Witness statements dated 13 February 2015 were provided by Mr Yisroel Hiller and by Mr Erik Wigertz.  Both gave oral evidence.

27. The Claimant (i) submitted that the Tribunal should not take any account of the facts and matters set out in paragraphs 85 to 120 of the First Affidavit of Mr Wigertz (or of the documents therein referred to) which formed part of the exhibit to Mr Wigertz' witness statement in these proceedings and that such facts and matters, which related to a telephone conversation which had taken place between the parties on 29 May 2014, should not be admitted in evidence; and (ii) informed the Tribunal that the Claimant placed no reliance on the contents of any of the communications which the First and

Second Respondents, in their affidavits in the WFO proceedings, had asserted to have attracted privilege.  The Tribunal acted accordingly and did as requested.

28. Oral opening and closing statements were made on behalf of the Claimant by Mr Justin Higgo.

29. The proceedings were transcribed.

30. The hearing was adjourned by the Tribunal on 14 April 2015 to permit the Claimant the opportunity to place a schedule before the Tribunal of the costs and expenses that it had incurred in the arbitration and, if so advised, to summarise in writing its closing submissions.

31. Supplemental written closing submissions were filed by the counsel for the Claimant by email on 17 April 2015, together with a schedule of costs and expenses.

V.     SUBMISSIONS AND EVIDENCE

a)  Background Facts

32. In view of the failure of the Respondents to attend or otherwise participate in this arbitration, the witness evidence of Mr Erik Wigertz and Mr Yisroel Hiller was not formally the subject of challenge.  The Tribunal accordingly questioned both Mr Erik Wigertz and Mr Yisroel Hiller in the course of the hearing in order to elucidate, clarify and test their evidence.  By reason of their responses to such questions and their evidence more generally, the Tribunal found both the witnesses' evidence to be clear, credible, careful and accurate.  Accordingly, those witnesses' evidence is adopted in this Award, save for the facts and matters referred to at paragraph 27 above.

33. The background facts are summarised below.

34. Between April 2013 and March 2014, the Claimant made a number of loans to the Third and Fourth Respondents, as set out in the table below.  The First Loan Agreement and the Increased Third Loan Agreements are included by way of background

8

notwithstanding the fact that they are not constitutive of the EG Loans giving rise to the instant Claims.

| | Date | Repayment Date | Borrower | Guarantor | Amount (USD) |
|---|---|---|---|---|---|
| First Loan Agreement | 03-04-13 | 17-05-13 | Third Respondent | Great Lakes Biodiesel Inc. | 4,500,000 Repaid in full on 22-05.13 |
| Second Loan Agreement | 22-05-13 | 20-11-13 | Third Respondent | (1) First Respondent (2) Second Respondent | 10,500,000 |
| Increased Second Loan Agreement | 23-08-13 | 21-08-14 | (1) Third Respondent (2) Fourth Respondent | (1) First Respondent (2) Second Respondent | Increase of 7 000,000 Total: 17,500,000 |
| Third Loan Agreement | 25-02-14 | 23-02-15 | (1) Fourth Respondent (2) Third Respondent | (1) First Respondent (2) Second Respondent | 3,500,000 |
| Increased Third Loan Agreement | 27-03-14 | 23-02-15 | (1) Fourth Respondent (2) Third Respondent | (1) First Respondent (2) Second Respondent | Increase of 9,000,000 Repaid on 15-07-2014 Total: 12 500,000 |

35. Mr Wigertz confirmed in his oral evidence, in response to questioning from the Tribunal, that his signature, and what he recognised as the signatures of the First and Second

Respondents, appeared on the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement.

36. The Claimant made a loan of USD 10,500,000 to the Third Respondent on 22 May 2013 pursuant to the Second Loan Agreement. Copies of the wire transfer confirmations for this loan were provided.

37. The Claimant increased this loan to USD 17,500,000 by providing a further loan of USD 7,000,000 to the Third and Fourth Respondents on 23 August 2013 pursuant to the Increased Second Loan Agreement. Copies of the wire transfer confirmations for this loan were verified by Mr Wigertz and provided to, and admitted in evidence by, the Tribunal.

38. Pursuant to Clause 7.1 of the Second Loan Agreement and the Increased Second Loan Agreement, the loans were to be repaid by the designated repayment date specified therein as 21 August 2014. By Clause 3 of both the Second Loan Agreement and the Increased Loan Agreement, the Respondents undertook to pay the Claimant interest at the stipulated rate from the date when the sums became payable under the Second Loan Agreement and the Increased Second Loan Agreement until the date of the Award.

39. The First and Second Respondents signed the Second Loan Agreement and the Increased Second Loan Agreement as personal guarantors. The Recitals in the Second Loan Agreement and the Increased Second Loan Agreement defined the First and Second Respondents as "Guarantors." Further:

   a. Clause 7.1 of the Second Loan Agreement provided that:

   *"The Borrower shall, and the Guarantors shall ensure that the Borrower shall, repay the loan in full, together with all remaining interest accrued thereon and not paid on any previous Interest Payment Date, on 20 November 2013 (the "Repayment Date")."*

    b.  Similarly, Clause 7.1 of the Increased Second Loan Agreement provided that:

> *"The Borrower shall, and the Guarantors shall ensure that the Borrower shall, repay the loan in full, together with all remaining interest accrued thereon and not paid on any previous Interest Payment Date, on 21 August 2014 (the "**Repayment Date**")."*

40.  The Claimant provided a loan of USD 3,500,000 to the Third and Fourth Respondents on 25 February 2014, pursuant to the Third Loan Agreement. Copies of the wire transfer confirmations for this loan were verified by Mr Wigertz and provided to, and admitted in evidence by, the Tribunal.

41.  Pursuant to Clause 7.1 of the Third Loan Agreement, the loan was to be repaid by the designated repayment date specified therein as *"12 months from the date of this Agreement"*, being 23 February 2015.  By Clause 3 of the Third Loan Agreement, the Respondents undertook to pay the Claimant interest at the stipulated rate from the date when the sums became payable under the Third Loan Agreement until, in the events which have in act occurred, the date of this Award.

42.  The Claimant increased this loan to USD 12,500,000 by providing a further loan of USD 9,000,000 on 27 March 2014 to the Third and Fourth Respondents pursuant to the Increased Third Loan Agreement. Copies of the wire transfer confirmations for this loan were verified by Mr Wigertz in evidence and provided to, and admitted as evidence by, the Tribunal.

43.  The First and Second Respondents signed the Third Loan Agreement and the Increased Third Loan Agreement as personal guarantors. The Recitals in the Third Loan Agreement and the Increased Third Loan Agreement defined the First and Second Respondents as "Guarantors."  As in the Second Loan Agreement and the Increased Second Loan Agreement, Clause 7.1 of the Third Loan Agreement (which was not amended in the Increased Third Loan Agreement) provided that:

*"The Borrower shall, and the Guarantors shall ensure that the Borrower shall, repay the loan in full, together with all remaining interest accrued thereon and not paid on any previous Interest Payment Date, on the date falling 12 months from the date of this agreement (the "Repayment Date")."*

44. The Third Loan Agreement further provided that under Clause 11.2, the Claimant was entitled to call in the loan early upon the occurrence of any *"Event of Default"*. In summary, so far as is material to the Claimant's pleaded Statement of Case, the *"Events of Default"* included:

    a.   the failure to pay interest when due (Clause 11.1(a));

    b.   the failure to ensure that representations or warranties provided to the Claimant were not misleading or incorrect in any material respect (Clause 11.1(c));

    c.   the failure to pay any financial indebtedness of any obligor when due (Clause 11.1(d));

    d.   the failure to provide accurate information about the borrowers' legal or financial condition to the Claimant (Clause 11.1(h)); or

    e.   the failure by First and Second Respondents to comply with the undertaking they provided in clause 10.8 (Clause 11.1(k)).

45. On 15 July 2014, the Respondents repaid the capital sum of USD 9,000,000 under the Increased Third Loan Agreement. Copies of the wire transfer confirmations for this payment were verified by Mr Wigertz in his evidence and provided to and admitted as evidence by, the Tribunal.

46. On 21 August 2014, the Claimant called in the loan pursuant to the Third Loan Agreement, relying upon Clause 11.2 of the same.

47. As set out in the table below, none of the Respondents has paid any of the sums due under the EG Loans, by the relevant Repayment Dates of the Second Loan Agreement, Increased Second Loan Agreement and/or the Third Loan Agreement, or at all:

|  | Date of Loan Agreement | Date of Transfer | Sum Transferred by the Claimant (USD) | Date Sums Repaid to the Claimant in full |
|---|---|---|---|---|
| First Loan Agreement | 03-04-13 | 03-04-13 | 4,500,000 | 22-05-13 |
| Second Loan Agreement | 22-05-13 | 22-05-13 | 4,545,000 | n/a |
|  |  | 23-05-13 | 4,612,000 |  |
|  |  | 17-07-13 | 1,343,000 |  |
| Increased Second Loan Agreement | 23-08-13 | 23-08-13 | 7,000,000 | n/a |
| Third Loan Agreement | 24-02-14 | 25-02-14 | 3,500,000 | n/a |
| Increased Third Loan Agreement | 26-03-14 | 27-03-14 | 250,000 | 15-07-2014 |
|  |  | 27-03-14 | 8,750,000 |  |

b) **Submissions as to liability**

48. The Claimant claims the outstanding capital of the EG Loans, amounting to USD 21,000,000 (see below as to sums sought as interest on the capital sums).

49. The Claimant submitted that the Respondents had failed to pay sums due under the EG Loans, by the relevant Repayment Dates of the Second Loan Agreement and the Increased Second Loan Agreement, namely 21 August 2014, or at all.

50. Relying upon the witness statements of Mr Erik Wigertz and Mr Yisroel Hiller, the Claimant had also submitted in the Request that certain *Events of Default*" under the Third Loan Agreement had occurred (including those under Clauses 11.1(a), 11.1(e), 11.1(h), and 11.1(k)), such that the USD 3,500,000 sum paid by the Claimant was due upon the Claimant calling in the loan and demanding repayment on 21 August 2014. In the light of the events which had occurred by the date of the hearing, the Claimant relied on the fact that the Respondents had failed to pay sums due under the EG Loans by the relevant Repayment Date of the Third Loan Agreement, namely 23 February 2015, or at all. The Claimant accordingly submitted that it was not necessary for the Tribunal to make any finding that the Claimant was additionally entitled to rely upon the default provisions in the Third Loan Agreement.

c) **Submissions as to interest**

51. For the purposes of these arbitral proceedings, the Claimant claims interest under the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement at only the contractual rate provided for by Clause 3 of the same (as distinct from the default rate) and only up until the date of the hearing and does not seek an award of interest at any higher rate or for any period extending beyond the date of the hearing. The Claimant submitted that the rate sought at the hearing was without prejudice to any entitlement to an award of interest at any higher rate or for any period extending beyond the date of the hearing; rather, it was a consequence of the Respondents not being represented at the hearing and the Claimant not wanting to take a point that had not been argued to the contrary by the Respondents. The amounts of interest claimed, and the basis of calculation in accordance with Clause 3, up to the date of the hearing are set out in the table below:

| Period End | Days in period | Date of payment | Interest Accrued @ 20% | Interest paid |
|---|---|---|---|---|
| 22/09/2013 | 31 | 20/09/2013 | 301,389 | 301,389 |
| 22/10/2013 | 30 | 22/10/2013 | 291,667 | 291,667 |
| 22/11/2013 | 31 | 25/11/2013 | 301,389 | 301,389 |
| 22/12/2013 | 30 | 15/02/2014 | 291,667 | 291,667 |
| 22/01/2014 | 31 | 30/01/2014 | 301,389 | 301,389 |
| 22/02/2014 | 31 | 24/02/2014 | 301,389 | 301,389 |
| 22/03/2014 | 28 | 20/03/2014 | 272,222 | 272,222 |
| 22/04/2014 | 31 | 07/05/2014 | 301,389 | 301,389 |
| 22/05/2014 | 30 | not made | 291,667 | 0 |
| 22/06/2014 | 31 | not made | 301,389 | 0 |
| 22/07/2014 | 30 | not made | 291,667 | 0 |
| 22/08/2014 | 31 | not made | 301,389 | 0 |
| 22/09/2014 | 31 | not made | 301,389 | 0 |
| 22/10/2014 | 30 | not made | 291,667 | 0 |
| 22/11/2014 | 31 | not made | 301,389 | 0 |
| 22/12/2014 | 30 | not made | 291,667 | 0 |
| 22/01/2015 | 31 | not made | 301,389 | 0 |
| 22/02/2015 | 31 | not made | 301,389 | 0 |
| 22/03/2015 | 28 | not made | 272,222 | 0 |
| 14/04/2015 | 23 | not made | 223,611 | 0 |

| Period End | Days in period | Date of payment | Interest Accrued @ 15% | Interest paid |
|---|---|---|---|---|
| 22/03/2014 | 28 | 21/03/2014 | 37,917 | 37,917 |
| 22/04/2014 | 31 | 29/04/2014 | 45,208 | 45,208 |
| 22/05/2014 | 30 | not made | 43,750 | 0 |
| 22/06/2014 | 31 | not made | 45,208 | 0 |
| 22/07/2014 | 30 | not made | 43,750 | 88,958 |
| 22/08/2014 | 31 | not made | 45,208 | 0 |
| 22/09/2014 | 31 | not made | 45,208 | 0 |
| 22/10/2014 | 30 | not made | 43,750 | 0 |
| 22/11/2014 | 31 | not made | 45,208 | 0 |
| 22/12/2014 | 30 | not made | 43,750 | 0 |
| 22/01/2015 | 31 | not made | 45,208 | 0 |
| 22/02/2015 | 31 | not made | 45,208 | 0 |
| 22/03/2015 | 28 | not made | 37,917 | 0 |
| 14/04/2015 | 23 | not made | 33,542 | 0 |

| Accrued Interest on Interest unpaid @ 20% | Total Accrued @ 20% |
|---|---|
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 291,667 |
| 5,023 | 598,079 |
| 9,884 | 899,630 |
| 15,237 | 1,216,256 |
| 20,427 | 1,538,072 |
| 24,792 | 1,854,530 |
| 30,641 | 2,186,561 |
| 34,676 | 2,512,903 |
| 40,855 | 2,855,147 |
| 46,046 | 3,202,582 |
| 46,278 | 3,521,082 |
| 41,492 | **3,786,185** |

| Accrued Interest on Interest unpaid @ 15% | Total Accrued @ 15% |
|---|---|
| 0 | 0 |
| 0 | 0 |
| 0 | 43,750 |
| 565 | 89,523 |
| 1,112 | 45,427 |
| 0 | 90,635 |
| 584 | 136,427 |
| 1,130 | 181,307 |
| 1,733 | 228,248 |
| 2,242 | 274,240 |
| 2,882 | 322,330 |
| 3,466 | 371,004 |
| 3,658 | 412,579 |
| 3,368 | **449,489** |

4,235,674

52. The Claimant accordingly sought:

    a. repayment by each of the Third and Fourth Respondents under the EG Loan Agreements in an amount of USD 25,235,674 (comprising USD 21,000,000 of capital and USD 4,235,674 of unpaid interest to 14 April 2015);

    b. damages in an equivalent amount against each of the First and Second Respondents under their guarantees; and

    c. Costs and expenses of the arbitration.

## VI.   FINDINGS ON LIABILITY

53. In respect of the Third and Fourth Respondents' liability, the Tribunal finds that:

    a. the Claimant paid sums totalling USD 21,000,000 to the Third and Fourth Respondents pursuant to the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement;

    b. the Third and Fourth Respondents failed to repay those sums on or before the designated Repayment Dates in the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement;

    c. by reason of the aforesaid, the unpaid sums, being both capital and interest, are liable to be repaid immediately by Third and Fourth Respondents.

54. With respect to the First and Second Respondents' guarantees, the Tribunal adopts the reasoning of Lord Diplock in *Lep Air Services v Rolloswin Ltd* [1973] AC 331 at 348H to 394A:

> *"It follows from the legal nature of the obligation of the guarantor to which a contract of guarantee gives rise that it is not an obligation himself to pay a sum of money to the creditor, but an obligation to see to it that another person, the debtor, does something; and that the creditors' remedy for the guarantor's failure to perform it lies in damages for breach of contract only...The legal consequence of this is that whenever the debtor has failed voluntarily to perform an obligation which is the subject of the guarantee the creditor can recover from the guarantor as damages for breach of his contract of guarantee whatever the*

*sum the creditor could have recovered from the debtor himself as a consequence of that failure. The debtor's liability to the creditor is also the measure of the guarantors.*

55. In accordance with that ratio decidendi in *Lep Air Services v Rolloswin Ltd*, a "see to it" guarantee in the form of Clause 7.1 of the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement, provides the Claimant with a claim in damages against the First and Second Respondents.

56. Accordingly, in respect of the First and Second Respondents' liability, the Tribunal finds that:

   a. the First and Second Respondents were parties to the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement. Clause 7.1. of each of the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement was accordingly binding on the First and Second Respondents;

   b. clause 7.1 of each of the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement was a contractual guarantee, having the effect that the First and Second Respondents were each personally liable to ensure that the Third and Fourth Respondents repaid the EG Loans in full, together with all remaining interest accrued thereon and not paid on any previous Interest Payment Date (as defined in the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement), on the Repayment Dates (as defined in the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement);

   c. the First and Second Respondents failed to repay the EG Loans on or before the designated Repayment Dates in the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement. Accordingly, the First and Second Respondents' personal liability to the Claimant under their guarantees is triggered;

    d.  by reason of the aforesaid, the unpaid sums, being both capital and interest, are due and owing to the Claimant from the First and Second Respondents.

57. In the event, the Tribunal accepts the Claimant's submission that it is not necessary for any finding to be made as to whether, or not, certain *"Events of Default"* under the Third Loan Agreement had occurred (including those under Clauses 11.1(a), 11.1(e), 11.1(h), and 11.1(k)), such that the USD 3,500,000 sum paid by the Claimant was due upon the Claimant calling in the loan and demanding repayment on 21 August 2014.  As set out in paragraph 56 above, the Tribunal is satisfied that  the Respondents failed to pay sums due under the EG Loans in advance of the relevant Repayment Date of the Third Loan Agreement, namely 23 February 2015, or at all, and are liable in respect of the USD 3,500,000 sum accordingly.  However, and for avoidance of any doubt, the Tribunal was also persuaded by the written evidence before it that *"Events of Default"* under the Third Loan Agreement had occurred.

## VII.    FINDINGS ON QUANTUM OF CAPITAL SUM

58. In accordance with the Tribunal's findings on liability above, it finds that the Claimant is entitled to repayment by each of the Third and Fourth Respondents of the capital sums owing under the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement, comprising USD 21,000,000.

59. The Tribunal further finds that the Claimant is entitled to damages against each of the First and Second Respondents under their guarantees in respect of the capital sums owing under the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement, comprising USD 21,000,000.  For the avoidance of doubt, in the event that any part of that sum shall have been paid by the Third and/or Fourth Respondent, the Claimant shall not be entitled to recover that amount as damages or at all from the First and/or Second Respondent.

## VIII.   FINDINGS ON CONTRACTUAL INTEREST

60. The Tribunal also finds that the Third and Fourth Respondents are liable to pay contractual interest pursuant to Clause 3 of the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement, and that they have not paid such contractual interest by the designated Repayments Dates or at all.  The Tribunal can find no justification in law for awarding interest on any basis or at any rate other than as provided for under the terms of the Agreements.  In the event, the Claimant in this arbitration seeks only contractual interest up until the date of the hearing and did not seek an award of interest at any higher rate or for any period extending beyond the date of the award. The Tribunal accordingly finds that the Third and Fourth Respondents are liable to pay the Claimant contractual interest of USD 4,235,674, being the total of unpaid contractual interest up until 14 April 2015, on which date the hearing occurred.

61. As stated above, the Tribunal finds that the First and Second Respondents' guarantees in the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement give rise to the First and Second Respondents' personal liability to the Claimant in respect of the interest as claimed on the EG Loans.  Accordingly, the First and Second Respondents are liable to pay the Claimant damages in respect of the remaining contractual interest of USD 4,235,674, being the total of unpaid contractual interest up until 14 April 2015, on which date the hearing occurred. Agai n for the avoidance of doubt, in the event that any part of that sum shall have been paid by the Third and/or Fourth Respondent, the Claimant shall not be entitled to recover that amount as damages or at all from the First and/or Second Respondent.

## IX.   COSTS

62. The Claimant seeks its costs and expenses of the arbitration in the total sum of £123,876.77.  Those costs and expenses comprise:
   a. the costs of the arbitration: £36,750.00
   b. solicitors' fees : £50,093.17
   c. counsel's fees: £32,000.00; and
   d. other incidental expenses: £5,033.60.

63. The Claimant expressly noted that the costs and expenses sought do not include the additional costs incurred ancillary to the arbitration claim in the injunction proceedings, which, by paragraph 11 of the WFO of Mr Justice Morgan on 30 October 2014, provided that the costs of that application be reserved to the further order of the Court.

64. In view of the findings set out above with respect to liability and quantum, and there being no grounds for departing from the principle set out in Article 28.4 of the LCIA Rules that the Tribunal's order as to costs should reflect the parties relative success, it follows that the Respondents are liable to pay the Claimant's costs of and occasioned by this arbitration.

65. Upon consideration of the Claimant's Schedule of Costs, and in accordance with Article 28.3, the Tribunal finds the Claimant's legal (and other) costs and expenses sought (outlined at sub-paragraphs 62.b. to 62.d. above) to be reasonable and properly claimed, save for the following heads of costs and expenses which the Tribunal has deducted from the sum claimed:

    a. Solicitors' fees of Mr Trevor Asserson, in the sum of £1,218.75, on account of the Claimant having failed to establish to my satisfaction Mr Asserson's involvement in the arbitration and the necessity and reasonableness of the same.

    b. Incidental expenses in respect of "taxi and dinner", in the sum of £27.28, on account of the Claimant having failed to establish to my satisfaction the necessity and reasonableness of the same.

Accordingly the Tribunal considers the Claimant's legal and others costs (other than the costs of the arbitration) which are reasonable and properly claimed amount to £85,880.74.

66. The Tribunal notes that the costs awarded do not include the additional costs incurred ancillary to the arbitration claim in the injunction proceedings, which, by paragraph 11 of the WFO of Mr Justice Morgan on 30 October 2014, provided that the costs of that application be reserved to the further order of the Court.

67. The total costs of the arbitration (other than the legal and other costs incurred by the Claimant itself), have been determined by the LCIA Court, pursuant to Article 28.1 of the applicable (1998) LCIA Rules to be as follows :

| | |
|---|---|
| Registration fee | £1,750.00 |
| LCIA's administrative charges | £9,741.73 |
| Tribunal's fees | £16,105.00 |
| Secretary's fees | £2,260.002 |
| Total costs of arbitration | £29,856.73 |

68. The above costs have been paid entirely by the Claimant and exceed the deposits lodged with the LCIA. Accordingly, the Claimant is therefore entitled to recover from the Respondents the total costs of the arbitration (£29, 856.73).

69. Article 28.2 of the LCIA Rules provides that unless the parties agree otherwise in writing the Tribunal shall determine the proportions in which the parties shall bear all or any part of the arbitration costs. Article 28.4 of the LCIA Rules provides that unless the parties have agreed otherwise in writing the Tribunal shall make its orders on both arbitration and legal costs on the general principle that costs should reflect the parties' relative success and failure in the arbitration except where it appears to the Tribunal that in the particular circumstances the general approach would be inappropriate. In this case the Claimant had succeeded on all of its claims against the 1st and 2nd Respondents, and effectively all of its claims against the 3rd and 4th Respondents, and the Tribunal considers, taking into account all of the matters to which it has referred in this award, that the Respondents and each of them shall pay to the Claimant all of the costs which the Claimant has funded.

70. Accordingly, the Respondents and each of them are liable to pay the Claimant's costs and expenses of the arbitration, assessed in the sum of £85,880.74 by way of the Claimant's legal and other costs and £29,856.73 by way of the costs of the arbitration. Again for the avoidance of doubt, in the event that any part of that sum shall have been paid by the Third and/or Fourth Respondent, the Claimant shall not be entitled to recover that amount from the First and/or Second Respondent.

## X.     AWARD

71. For the reasons set out above the Tribunal makes the following orders:

   a. The Third and Fourth Respondents shall pay to the Claimant the sum of USD 21,000,000 owing under the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement;

   b. The First and Second Respondents shall pay the sum of USD 21,000,000 by way of damages pursuant to their guarantees in respect of the capital sums owing under the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement;

   c. The Third and Fourth Respondents shall pay to the Claimant the sum of USD 4,235,674 by way of interest pursuant to pursuant to Clause 3 of the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement;

   d. The First and Second Respondents shall pay to the Claimant the sum of  USD 4,235,674 by way of damages pursuant to their guarantees in respect of the interest owing under the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement;

   e. The Respondents and each of them shall pay the sum of £85,880.74 by way of the Claimant's legal and other costs and £29,856.73 by way of the costs of the arbitration.

EDWIN GLASGOW QC

Sole Arbitrator

Dated: 30ᵗʰ April 2015

Seat of the arbitration: London

EXHIBIT "C"

Claimant
YI Hiller
Witness Statement
Exhibit YIH1
5 August 2015

Claim No.: ____

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

**AND**

**IN THE MATTER OF THE ARBITRATION ACT 1996**
**IN THE MATTER OF AN ARBITRATION CLAIM**

**B E T W E E N:**

**EAST GUARDIAN SPC**

**Applicant**

**- and -**

**(1)  EINER ENERGY SÁRL**
**(2)  NORTH SEA BIODIESEL A/S**
**(3)  ARIE MAZUR**
**(4)  CONSTANTIN LUTSENKO**

**Respondents**

---

**WITNESS STATEMENT OF YISROEL ISSER HILLER**

---

I, **YISROEL ISSER HILLER**, of 38 Wigmore Street, London, W1U 2RU, will say as follows:

1.  I am a solicitor and senior associate with Asserson Law Offices ("**ALO**"), an English law firm which has offices in London and Tel Aviv. I am instructed to act in these proceedings on behalf of EG, East Guardian SPC ("**EG**").

2.  I make this witness statement in support of EG's application for an order (in the terms of the draft order appended to the Claim Form):

    2.1.  For leave to enforce an LCIA arbitration award dated 30 April 2015 Pursuant to section 66(1) of the Arbitration Act 1996; and

1

2.2.   To enter judgment in terms of the said award pursuant to section 66(2) of the Arbitration Act 1996; and

2.3.   That the Defendants pay the costs of this application, including the costs of any judgment which may be entered, such costs to be summarily assessed if not agreed.

3.   Unless otherwise stated, the facts and matters to which I refer in this witness statement are within my own knowledge and I believe them to be true. Where the facts and matters to which I refer are otherwise than within my knowledge, I identify the source of the information and they are true to the best of my knowledge, information and belief.

4.   Where I refer to documents I exhibit true copies hereto in an exhibit marked "**YIH1**". All page references refer to pages in that exhibit.

**I    Background**

5.   The parties' dispute arose out of the Respondents' breach of loan agreements between the parties (the "**Loan Agreements**") and the Respondents' failure to repay the loans which the Claimant issued between April 2013 and March 2014 to Einer (Respondent 1), and to its former subsidiary, NSB (Respondent 2).

6.   Respondent 3 and Respondent 4 provided personal guarantees for each of the loans issued by EG to Einer and / or to NSB in August 2013 and February 2014.

7.   The cumulative sum of these loans amounted to USD 30,000,000; capital of USD 21,000,000 and interest of USD 939,652 was due to be repaid on 23 August 2014. No repayments have been made and the loans are in default. The outstanding loan interest stands at USD 1,268,244.

8.   A schedule setting out the loan amounts, borrowers, guarantors and repayment dates in regard to the loans EG provided to the Respondents under the parties' various loan agreements is at [YIH1:1].

**II    Particulars of arbitration agreement**

9.   The 23 August 2013 and 24 February 2014 Loan Agreements between the parties provide that those Agreements and any non-contractual obligations arising out of or in connection with those agreements are governed by the laws of England and Wales without regard for conflict of laws principles

(clause 22.1 in the August 2013 agreement and clause 21.1 in the February 2014 agreement).

10.   Both Loan Agreements also provide (at clauses 22.2 and 21.2, respectively):

*"In the event of a dispute arising out of or relating to this contract, including any question regarding its existence, validity or termination, the dispute shall be referred to and finally resolved by arbitration under LCIA rules, which rules are deemed to be incorporated by reference into this clause.   The language to be used in the mediation and in the arbitration shall be English.   The Arbitral Tribunal shall consist of one arbitrator who shall be an English lawyer of at least ten years standing and be appointed by the LCIA.   The Parties hereto hereby submit to the exclusive jurisdiction of the LCIA.   Any judgment shall be final and binding upon the Parties as to the subject matter decided."*

11.   Copies of the loan agreements containing the said arbitration clauses are at [YIH1:2-44].

## III   The LCIA Arbitration

12.   By its Request for Arbitration dated 23 September 2014 the Claimant commenced an arbitration against the Respondents in the London Court of International Arbitration ("LCIA").

13.   The LCIA confirmed the seat of the arbitration as London, England and on 25 November 2014 appointed Mr Edwin Glasgow CBE QC as sole arbitrator to determine the dispute.

14.   A final hearing in the arbitration was held on 14 April 2015 at the International Dispute Resolution Centre in London.

15.   Following the final hearing the tribunal issued its award on 30 April 2015 (the "**Award**").   A copy of the Award is at [YIH1:45-68] and is also appended to the Claim Form.

16.   The Applicant obtained worldwide freezing orders under section 44 of the Arbitration Act 1996 against Respondent 3 and Respondent 4 by Order of Mr Justice Morgan dated 22 September 2014.   Similar relief was obtained against the Third Respondent in Canada.

17.   Each of Respondent 3 and Respondent 4 participated in the WFO proceedings in this jurisdiction for a period of time, including by solicitors, and filed evidence supporting a challenge to the grant of the WFO on

3

technical grounds alleging that reference has improperly been made to discussions which were protected by without prejudice privilege. Mr Justice Morgan considered and rejected that argument at the return date when he continued the WFO on 30 October 2014.   The Canadian Courts rejected a similar challenge to the grant of relief in Canada by Respondent 3.

**IV**     **The terms of the Tribunal's award**

18.     Pursuant to the Award the Tribunal made the following orders:

18.1.   The Third and Fourth Respondents shall pay to the Claimant the sum of USD 21,000,000 due and owing under the relevant loan agreements;

18.2.   The First and Second Respondents shall pay the sum of USD 21,000,000 by way of damages pursuant to their guarantees in respect of the capital sums owing under the loan agreements;

18.3.   The Third and Fourth Respondents shall pay to the Claimant the sum of USD 4,235,674 by way of interest;

18.4.   The First and Second Respondents shall pay to the Claimant the sum of USD 4,235,674 by way of damages pursuant to their guarantees in regard to the said interest;

18.5.   The Respondents and each of them shall pay the sum of £85,880.74 by way of the Claimant's legal and other costs and £29,856.73 by way of the costs of the arbitration.

**V**     **Respondents' failure to comply with the Award and remedies sought**

19.     The Respondents have failed to pay any of the sums so ordered.

20.     The Claimant accordingly seeks leave to enforce the Award and applies to enter judgment in the terms of the Award, pursuant to sections 66(1) and 66(2) of the Arbitration Act 1996.

21.     Respondent 1 and Respondent 3 have assets in jurisdictions in which an English judgment can be enforced and this application is made to ensure recovery of the Award is effective.

22.  There are no grounds upon which any challenge can be made to the validity of the Award or the substantive jurisdiction of the Tribunal to make the Award that I am aware of.

**VI    Parties' details (CPR 62.18(6)(b)) and Post-award interest (CPR 62.19)**

23.  The usual or last known places of business and/or of residence of the Claimant and of the Respondents are set out in the Claim Form (and the Respondents' addresses are set out below).

24.  The Claimant did not seek, and the Award did not provide for, any post-award interest.

**VII   Service out of the Jurisdiction**

25.  Each of the Respondents is out of the jurisdiction.  In the circumstances the Applicant seeks permission to serve the Arbitration Claim Form out of the jurisdiction under CPR Part 62.5(1)(c) on the grounds that the seat of the arbitration was in this jurisdiction.

26.  The countries and places in which each of the Respondents can be found are as follows:

26.1.  Respondent 1 is a company incorporated in Luxembourg; its address is 1B Heinhaff, L-173, Senningerberg, Luxembourg;

26.2.  Respondent 2 is a Norwegian company; its address is Oraveien 2, 1630 Gamle Fredrikstad, Norway;

26.3.  Respondent 3 is resident in Canada at 50 Lawrence Crescent, Toronto, Ontario, Canada, M4N 1N2; and

26.4.  Respondent 4 is resident in Russia at M. Novopeskovski 8-36, Moscow 121099, Russian Federation.

27.  The periods for filing an acknowledgement of service are set out in the draft Order.

**VII   Translation of the Award**

28.  The Applicant seeks permission not to have to translate the Award.  English was the language of the Arbitration and the relevant individuals speak and read English.

**STATEMENT OF TRUTH**

I believe that the facts stated in this witness statement are true.

Signed _____          Dated: 5 August 2015

**Yisroel Isser Hiller**

On behalf of: Claimant
YI Hiller
1st Witness Statement
Exhibit YIH1
5 August 2015
Claim No.:

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

**AND**

**IN THE MATTER OF THE ARBITRATION ACT 1996**
**IN THE MATTER OF AN ARBITRATION CLAIM**

**B E T W E E N:-**

**EAST GUARDIAN SPC**

**Claimant**

**-and-**

**ARIE MAZUR**

**First Respondent**

**CONSTANTIN LUTSENKO**

**Second Respondent**

**EINER ENERGY SÁRL**

**Third Respondent**

**NORTH SEA BIODIESEL A/S**

**Fourth Respondent**

**EXHIBIT YIH1**
**INDEX**

| Exhibit | Document | Page Number |
|---------|----------|-------------|
| **1** | Schedule setting out loan amounts, borrowers, guarantors and repayment dates | 1 |
| **2** | 23 August 2013 and 24 February 2014 Loan Agreements | 2-44 |
| **3** | Final LCIA Award | 45-68 |

On behalf of: Claimant
YI Hiller
1st Witness Statement
Exhibit YIH1
5 August 2015
Claim No.:

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

**AND**

**IN THE MATTER OF THE ARBITRATION ACT 1996**
**IN THE MATTER OF AN ARBITRATION CLAIM**

**B E T W E E N:-**

**EAST GUARDIAN SPC**

**Claimant**

**-and-**

**ARIE MAZUR**

**First Respondent**

**CONSTANTIN LUTSENKO**

**Second Respondent**

**EINER ENERGY SÁRL**

**Third Respondent**

**NORTH SEA BIODIESEL A/S**

**Fourth Respondent**

**EXHIBIT YIH1**

This is Exhibit "YIH1" referred to in the first witness statement of Yisroel Isser Hiller dated 5 August 2015.

| | Date | Repayment Date | Borrower | Guarantor | Amount (USD) |
|---|---|---|---|---|---|
| First Loan Agreement | 03-04-13 | 17-05-13 | Third Respondent | Great Lakes Biodiesel Inc. | 4,500,000 Repaid in full on 22-05.13 |
| Second Loan Agreement | 22-05-13 | 20-11-13 | Third Respondent | (1) First Respondent (2) Second Respondent | 10,500,000 |
| Increased Second Loan Agreement | 23-08-13 | 21-08-14 | (1) Third Respondent (2) Fourth Respondent | (1) First Respondent (2) Second Respondent | Increase of 7 000,000 Total: 17,500,000 |
| Third Loan Agreement | 25-02-14 | 23-02-15 | (1) Fourth Respondent (2) Third Respondent | (1) First Respondent (2) Second Respondent | 3,500,000 |
| Increased Third Loan Agreement | 27-03-14 | 23-02-15 | (1) Fourth Respondent (2) Third Respondent | (1) First Respondent (2) Second Respondent | Increase of 9,000,000 Repaid on 15-07-2014 Total: 12 500,000 |

**YIH1/1**

**USD 17,500,000**

**LOAN AGREEMENT**

**EAST GUARDIAN REAL PROPERTY SEGREGATED PORTFOLIO**

as Lender

and

**EINER ENERGY SARL**

as First Borrower

and

**UNIOL AS**

as Second Borrower

and

**ARIE MAZUR**

and

**CONSTANTIN LUTSENKO**

as Guarantors

**YIH1/2**

## TABLE OF CONTENTS

CLAUSE                                                                          PAGE

1.    Definitions and Interpretation ...................................................................4

2.    Loan Facility.............................................................................................7

3.    Payment and Calculation of Interest on Loan.......................................8

4.    Taxes........................................................................................................9

5.    Tax Payments...........................................................................................10

6.    Pre-existing Claims..................................................................................10

7.    Repayment of Loan..................................................................................10

8.    Reporting..................................................................................................10

9.    Right of First Refusal ..............................................................................12

10.   Representations........................................................................................12

11.   Undertakings............................................................................................13

12.   Events of Default .....................................................................................14

13.   Indemnity .................................................................................................16

14.   Costs and Expenses ................................................................................17

15.   Partial Invalidity.......................................................................................17

16.   Remedies and Waivers............................................................................17

17.   Amendments............................................................................................17

18.   Assignments ............................................................................................18

19.   Notices and Language .............................................................................18

20.   Counterparts ............................................................................................19

21.   Entire Agreement.....................................................................................20

22.   Applicable Law and Jurisdiction .............................................................20

**YIH1/3**

This **LOAN AGREEMENT** (the "**Agreement**") is dated 23 August 2013 and made between:

(1)   **East Guardian Real Property Segregated Portfolio, a segregated portfolio within East Guardian SPC,** a company limited by shares, established under the laws of The Cayman Islands, with address at c/o Maples Corporate Services Ltd., P.O. Box 309, Ugland House, South Church Street, Grand Cayman KY1-1104, Cayman Islands (the "**Lender**");

(2)   **Einer Energy SARL**, a company incorporated under the laws of Luxembourg, having registration number B154463 and its registered address at 1B Heienhaff, L-1736 Senningerberg, Luxembourg (the "**First Borrower**");

(3)   **Uniol AS**, a Norwegian private limited company (*aksjeselskap*) organized and existing under the laws of Norway, with its registered office at Øraveien 2, 1630 Gamle Fredrikstad, Norway, registered with the Norwegian Registry of Enterprises under registration number 990 154 848 (the "**Second Borrower**");

(the First Borrower and the Second Borrower together, the "**Borrowers**" and each a "**Borrower**")

(4)   **Arie Mazur**, a national of Canada residing at 32 Stratheden Road, Toronto, Ontario, Canada, M4N 1E4 ("**Mazur**"); and

(5)   **Constantin Lutsenko**, a national of Russia residing at M. Novopeskovski 8-36 Moscow. 121099. Russian Federation ("**Lutsenko**").

(Mazur and Lutsenko hereinafter referred to as "**Guarantor**" or "**Guarantors**" depending on context, and Guarantors, Borrowers and Lender together hereinafter referred to as the "**Parties**")

**WHEREAS**:

(A)   By a Loan Agreement dated 3 April 2013, the Lender advanced the sum of USD 4,500,000.00 to the First Borrower, to be repaid on or around 22 May 2013 with interest (the "**First Loan**").

(B)   By a Loan Agreement dated 22 May 2013, the Lender agreed to advance to the First Borrower a total amount of USD 10,500,000 (Ten Million Five Hundred Thousand United States Dollars even) (the '**Second Loan**') inclusive of the First Loan for the continuing purpose of financing the Borrower's business activities, specifically the purchase of feedstock for refining into biodiesel in Norway, the refining of the biodiesel, and transportation and sale to customers on the world market ('the **"Activities"**). Advances were made by the Lender to the First Borrowers under the Second Loan on [*insert date(s)*].

1303133 27656796 53

**YIH1/4**

**(C)**     The Lender is willing to advance hereunder to the Borrowers a total amount of USD 17,500,000 (Seventeen Million Five Hundred Thousand United States Dollars even) inclusive of the Second Loan for the continuing purpose of financing the Borrowers' Activities.

**(D)**     The Parties have entered into this Agreement in order to document the terms governing the secured term loan to be made by the Lender to the Borrowers on 23 August 2013 in order to finance the Project.

**IT IS AGREED** as follows:

**1.      DEFINITIONS AND INTERPRETATION**

1.1     In this Agreement:

"**Activities**" has the meaning given to such term in Recital (B).

"**Assignment of Proceeds**" means an Assignment of Proceeds given by Borrowers in favor of Lender this day, attached hereto as Attachment A, and/or future such documents in similar form, substance and intent.

"**Assignment of Title**" means a Declaration of Charge and Assignment of Title given by Borrowers in favor of Lender this day, attached hereto as Attachment B, and/or future such documents in similar form, substance and intent.

"**Business Day**" means a day on which banks are open for business in both England and Wales and Luxembourg and Norway and for the avoidance of doubt shall not include Saturdays, Sundays, bank and public holidays in these places.

"**Canadian Affiliates**" means Einer Canada Inc., with offices at 1200 Bay Street, Suite 202, Toronto, Ontario, Canada, M5R 2A5, and Great Lakes Biodiesel Inc., with offices at 77 Bloor Street West, Suite 1200, Toronto, Ontario, Canada, M5S 1M2.

"**Continuing**" means that an Event of Default has not been remedied or waived.

"**Default Rate**" has the meaning given to such term in Clause 3.6.

"**Disbursement Date**" has the meaning given to such term in Recital (D).

"**Escrow Account**" has the meaning given to such term in Clause 2 2.

"**Event of Default**" means any one of the events specified in Clause 12 (Events of Default) hereof.

**YIH1/5**

"**Finance Documents**" means this Agreement, the Security Documents, and any other document designated as a "Finance Document" by the Borrowers and the Lender.

"**Financial Indebtedness**" means any indebtedness for or in respect of:

(a)     moneys borrowed;

(b)     any amount raised by acceptance under any acceptance credit facility or dematerialised equivalent;

(c)     any amount raised pursuant to any note purchase facility or the issue of bonds, notes, debentures, loan stock or any similar instrument;

(d)     the amount of any liability in respect of any lease or hire purchase contract which would, in accordance with generally accepted accounting principles of the Borrowers' jurisdictions of incorporation, be treated as a finance or capital lease;

(e)     receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis);

(f)     any amount raised under any other transaction (including any forward sale or purchase agreement) having the commercial effect of a borrowing;

(g)     any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price (and, when calculating the value of any derivative transaction, only the marked to market value shall be taken into account);

(h)     any counter-indemnity obligation in respect of a guarantee, indemnity, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution; and

(i)     the amount of any liability in respect of any guarantee or indemnity for any of the items referred to in paragraphs (a) to (h) above.

"**Group**" means the Borrowers and each of their Subsidiaries from time to time.

"**Insolvency Event**" means any one or more of the following in relation to any person:

(a)     it is unable to pay its debts as they fall due; or

(b)     the value of its liabilities (including its contingent and prospective liabilities) exceeds the value of its assets; or

**YIH1/6**

(c)     it fails to comply with any actions and/or requirements under the companies' and insolvency laws of Luxembourg as provided in the Addendum to this Agreement; or

(d)     execution or other process issued on a judgment, decree or order of a court in favour of a creditor of it is returned wholly or partly unsatisfied; or

(e)     it has taken any action or steps have been taken or legal proceedings have been started or threatened against it for (i) its winding up, liquidation, administration, dissolution, amalgamation, reconstruction, reorganisation, arrangement, adjustment, consolidation or protection or relief of creditors (whether by way of voluntary arrangement, scheme of arrangement or otherwise), or (ii) the enforcement of any security interest over any or all of its assets; or (iii) the appointment of a liquidator, receiver, controller, inspector, manager, supervisor, administrative receiver, administrator, trustee or similar officer or official of it or of any or all of its assets; or

(f)     it is, in any jurisdiction, subject to or threatened by any actions, steps, procedures or other proceedings under any applicable bankruptcy, insolvency, rehabilitation or other reorganisation laws; or

(g)     any actions, steps, procedures or other proceedings equivalent or analogous to any of those set out in any of (a) - (h) above (inclusive) of this definition have been taken, started or threatened against it in any jurisdiction, including the seeking by it (or any other person in relation to it) of winding up, liquidation, administration, dissolution, amalgamation, reconstruction, reorganisation, arrangement, adjustment, consolidation or protection or relief of creditors.

"**Interest Payment Date**" means the 22nd calendar day of each month (or if that day is not a Business Day the first Business Day thereafter).

"**Loan**" has the meaning given to such term in Clause 2.1.

"**Obligor**" means each Borrower and each Guarantor.

"**Material Adverse Effect**" has the meaning given to such term in Clause 12.1(g) (Termination due to Events of Default).

"**Repayment Date**" has the meaning given to such term in Clause 7.1 (Repayment of Loan).

"**Revolving Account**" shall mean that account to be set up in the name of the Lender (not later than 7 Business Days after the date hereof unless extended

**YIH1/7**

by mutual agreement of the Lender and Borrowers) into which Borrowers shall have the right to make interim repayments in an amount of not less than USD 1,000,000 (One Million United States dollars even) per repayment at any time before the Repayment Date, and out of which the Borrowers shall have the right to request interim drawdowns up until 30 (thirty) days before the Repayment Date.

"**Security Documents**" shall mean the Assignment of Proceeds and the Assignment of Title and other documents as may be agreed between the Parties.

"**Subsidiary**" means a subsidiary within the meaning of section 1159 of the Companies Act 2006.

1 2    Unless otherwise indicated herein, any reference to the plural includes the singular and any reference to the singular includes the plural.

1.3    A reference to a Finance Document or any other agreement or instrument is a reference to that Finance Document or other agreement or Instrument as amended, novated, supplemented, extended or restated.

1.4    Unless expressly provided to the contrary in this Agreement, the "**Borrower**", the "**Lender**", any "**Obligor**", any "**Party**" or any other person shall be construed so as to include its successors in title, permitted assigns and permitted transferees

1.5    Unless expressly provided to the contrary in this Agreement, a person who is not a party to this Agreement may not enforce any of its terms under the concept of a contract for the benefit of a third party and, notwithstanding any term of this Agreement, no consent of any third party is required for any variation (including any release or compromise of any liability) or termination of this Agreement.

1.6    Any reference in this Agreement to a "**Clause**" or a "**Schedule**" shall, subject to any contrary indication, be construed as a reference to a clause or a schedule hereof.

2.    **LOAN FACILITY**

2.I    The Lender shall make available on  23 August 2013 to the Borrowers a loan facility (the "**Loan**") in the amount of USD 17,500,000 (Seventeen Million Five Hundred Thousand United States Dollars), upon the terms and conditions of this Agreement.

2.2    All amounts advanced to the Borrowers pursuant to this Loan Facility shall be to the Borrowers' current account in an account created for the purposes of the

**YIH1/8**

transactions contemplated in this Agreement (the "Escrow Account"), unless otherwise agreed in writing by both the Borrowers and the Lender.

2.3     The Lender shall have full access to the Escrow Account records, and shall have joint signing authority together with the Borrowers for all payments made by the Borrowers during the term of this Agreement.

2.4     Each amount advanced pursuant to this Loan Facility shall require the Borrowers to provide the additional security provided for in the Assignment of Title and Assignment of Proceeds documents, in the form and substance as set forth in Schedule A to this Agreement.

2.5     The drawdown period for advances under this Loan Facility shall be up to 45 (forty five) calendar days.  Requests for funding shall be in writing, by letter or email.

2.6     All sales revenues of the Borrowers shall be deposited in the Escrow Account, unless otherwise agreed in writing by each of the Borrower and the Lender.

2.7     The Borrowers shall apply all amounts borrowed under this Agreement towards financing the Activities.

2.8     The Lender is not obliged to monitor or verify how any amount borrowed under this Agreement is used but retains all rights hereunder and by action of applicable law to demand and receive full information as to use of funds from the effective date hereof through the date of such demand.

3.      PAYMENT AND CALCULATION OF INTEREST ON LOAN

3.1     Starting from the date of this Agreement and for the duration of this Agreement the Borrowers undertake to pay to the Lender on each Interest Payment Date a charge equal to USD 145,833 (One Hundred and Forty Five Thousand Eight Hundred and Thirty Three United States Dollars even) from which there shall be deducted any interest payable under Clause 3.3 that has accrued in respect of the month immediately preceding the Interest Payment Date.

3.2     In addition to the interest payable pursuant to Clause 3.3 below, from (and including) the Disbursement Date until (and including) the day prior to the Repayment Date the Borrowers undertake to pay to the Lender on each Interest Payment Date a fee equal to 7 per cent per annum on the total undisbursed portion of the Loan or in the Revolving Account in excess of USD 8,750,000 (Eight Million Seven Hundred and Fifty Thousand United States Dollars even).

3.3     The Borrowers undertake to pay to the Lender interest on all amounts advanced on the Loan from (and including) the Disbursement Date until (and including) the day prior to the Repayment Date at 20 per cent per annum.

**YIH1/9**

3.4     Any interest shall accrue on a day-to-day basis, calculated according to the actual number of days elapsed and a year of 360 days.

3.5     The Borrowers shall pay accrued interest on the Loan on every Interest Payment Date and on the Repayment Date.

3.6     If the Borrowers do not pay any sum they are obliged to pay under the Finance Documents when it is due, the Borrowers shall pay interest on that unpaid amount from time to time outstanding at the rate per annum which is 2% higher than the rate of interest specified under Clause 3.2 (the "**Default Rate**"), for the period beginning on its due date and ending on the date the Lender receives it, both before and after judgment.

4.      **TAXES**

4.1     All payments to be made by any Obligor hereunder shall be made free and clear of and without deduction for or on account of tax unless the Obligor is required to make such a payment subject to the deduction or withholding of tax, in which case the sum payable by the Obligor (in respect of which such deduction or withholding is required to be made) shall be increased to the extent necessary to ensure that the Lender receives a sum net of any deduction or withholding equal to the sum which it would have received if no such deduction or withholding had been made or required to be made. The Lender and the Obligor shall, upon written request of the Obligor specifying the action required by the Lender, co-operate in completing procedural formalities necessary for the Obligor to obtain authorization to make payments without a tax deduction.

4 2     Without prejudice to Clause 4.1 (Taxes), if the Lender is required to make any payment of or on account of tax on or in relation to any sum received or receivable hereunder (including any sum deemed for purposes of tax to be received or receivable by the Lender whether or not actually received or receivable) or if any liability in respect of any such payment is asserted, imposed, levied or assessed on or against the Lender, the Borrower shall, upon demand of the Lender, promptly indemnify the Lender against such payment or liability, together with any interest, penalties, costs and expenses payable or incurred in connection therewith, provided that this Clause 4.2 (Taxes) shall not apply to any tax imposed on and calculated by reference to the net income actually received or receivable by the Lender by the jurisdiction in which the Lender is incorporated.

4.3     If the Lender intends to make a claim pursuant to Clause 4.2 (Taxes), it shall notify the relevant Obligor(s) in writing in reasonable detail of the event giving rise to the claim and of the basis of calculation of such claim, provided that the

**YIH1/10**

Lender shall not be required to disclose any confidential information relating to the organization of its affairs.

## 5.    TAX PAYMENTS

5.1    If, at any time, any Obligor is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Obligor shall promptly notify the Lender.

5.2    If any Obligor makes any payment hereunder in respect of which it is required to make any deduction or withholding, it shall pay the full amount required to be deducted or withheld to the relevant taxation or other authority within the time allowed for such payment under applicable law and shall deliver to the Lender, within thirty (30) days after it has made such payment to the applicable authority, an original receipt (or a certified copy thereof) issued by such authority evidencing the payment to such authority of all amounts so required to be deducted or withheld.

5.3    No provision of this Agreement shall interfere with the right of the Lender to arrange its tax or any other affairs in whatever manner it thinks fit, oblige the Lender to claim any credit, relief, remission or repayment in respect of any payment under Clause 4 (Taxes) nor oblige the Lender to disclose any information relating to its tax or other affairs or any computations in respect thereof.

## 6.    THIRD PARTY CLAIMS

6.1    Any sums advanced hereunder by the Lender to the Borrowers shall not be used for the payment of any claims (whether pre-existing or arising hereafter) against any Obligor or the Group by third parties.

6.2    If any Obligor is required to make any payment of or on account of any such claims or if any liability in respect of any such claims is asserted, imposed, levied or assessed on or against the Obligor, the Obligor shall ensure that no funds advanced by or assigned to the Lender are used in satisfaction of such claims, upon demand of the Lender, promptly indemnify the Lender against such payments or liability, together with any interest, penalties, costs and expenses payable or incurred in connection therewith by the Lender.

## 7.    REPAYMENT OF LOAN

7.1    The Borrowers shall, and the Guarantors shall ensure that the Borrowers shall, repay the Loan in full, together with all remaining interest accrued thereon and not paid on any previous Interest Payment Date, on 21 August 2014 (the "**Repayment Date**").

**YIH1/11**

7.2     No amount repaid pursuant to this Clause may be re-borrowed unless otherwise agreed in writing by the Lender.

7 3     All payments to be made under this Agreement shall be calculated and made without (and free and clear of any deduction for) set-off or counterclaim.

## 8.     REPORTING

8.1     The Borrowers shall provide weekly reports to the Lender, in form and substance acceptable to the Lender, as to the status of their operations and accounts, such report to also contain a summary of anticipated drawdown requests to be submitted to the Lender pursuant to this Agreement in the forthcoming 30-60 day period.

8.2     All shipping documents shall be endorsed, notified or confirmed to the Lender at the preference of the Lender.

8.3     Within seven days of submission or receipt (as applicable), copies of invoices for each sale made by the Borrowers to end purchasers and the corresponding confirmation of receipt of funds shall be sent by the Borrowers to the Lender.

8.4     Upon request of the Lender, but no less than once a month, the Borrowers shall provide at their own expense:

8.4.1   reports from SGS/Inchape or such other a third party surveyor acceptable to the Lender, including the receipt of product, its quantity and quality;

8.4.2   monthly management accounts in form and substance acceptable to the Lender together with copies of audited accounts that are compliant with reporting requirements applicable in Luxembourg; and

The Borrowers hereby expressly agree that failure to provide any of such documents in the form, substance and time provided shall constitute an Event of Default for purposes of this Agreement.

## 9.     RIGHT OF FIRST REFUSAL

9.1     The Lender shall have the right to participate in any future financing obtained by the Lender or the Group.  Each Borrower shall give to the Lender notice in writing of its desired intention to obtain financing.  Such notice shall set out the party from whom the relevant Borrower intends to obtain financing, the principal sum to be borrowed, the term, interest and other conditions of the transaction. The Lender and/or related entities shall have the right to match not less than 50% of the financed amount, on the same terms and conditions.

**YIH1/12**

9.2    The Lender and/or related entities shall have the right to participate in the purchase by a Borrower or any member of the Group, or any of its shareholders, of the refinery in Estonia, Biodiesel Paldiski AS, located at Rae põik 9, Paldiski. 76801, Estonia. for not less than 50% of the share capital, on terms similar to those obtained by the relevant Borrower, the Group, or any of their shareholders.

9.3    Should a Borrower or the Group wish to buyout the debt owed by the Second Borrower to the Raiffeisen Bank (Loan Agreement dated 2 October 2007, amended 6 December 2010, and re-amended start August 2013), they shall give the Lender notice in writing of their intention to do so.  Such notice shall set out the conditions of the transaction and the parties involved.

## 10.    REPRESENTATIONS AND WARRANTIES

The Obligors make the representations and warranties set out in this Clause 10 (Representations) to the Lender on the date of this Agreement. The Obligors will be deemed to repeat the representations and warranties set out in this Clause 7 (Representations) every day until the Repayment Date.. The Obligors acknowledge that the Lender has entered into this Agreement in reliance on and in consideration for these representations and warranties and that the Obligors shall be jointly and severally liable to the Lender for any failure thereof.

10.1    The First Borrower is a company duly incorporated, validly existing and in good standing under the laws of Luxembourg.

10.2    The Second Borrower is a company duly incorporated, validly existing and in good standing under the laws of Norway.

10.3    The Obligors have the power to enter into, perform and deliver, and have taken all necessary action to authorize their entry into, performance and delivery of, this Agreement and the transactions contemplated thereby.

10.4    The entry into, performance and the transactions contemplated by this Agreement does not and will not conflict with: any law or regulation applicable to the Obligors; the Borrower's constitutional documents; or any agreement or instrument binding upon the Obligors or any of their assets.

10.5    The obligations expressed to be assumed by them in this Agreement are legal, valid, binding and enforceable obligations.

10.6    No Event of Default has occurred and is Continuing or might reasonably be expected to result from the making of the Loan or the entry into, the performance or, or any transaction contemplated by, any Finance Document.

**YIH1/13**

10.7   No litigation, arbitration or administrative proceedings of or before any court, arbitral body or agency have (to the best of its knowledge and belief) been started or threatened against the Obligors, jointly or severally.

10.8   The Borrowers have not incurred any outstanding Financial Indebtedness other than the Financial Indebtedness governed by this Agreement.

## 11.   UNDERTAKINGS

11.1   The Obligors shall procure that on the date of this Agreement:

11.1.1   The Guarantors provide the Lender with duly executed copies of the Security Documents.

11.2   The Obligors and Group entities shall comply in all respects with all laws to which they may be subject.

11.3   The Borrowers shall not (and the Borrowers shall procure that no member of the Group will), without the Lender's prior written consent, incur or allow to remain outstanding any Financial Indebtedness other than Financial Indebtedness incurred under this Agreement.

11.4   The Obligors shall not:

(a)   create, or permit to subsist, any Security on or over the Borrowers, Group entities or any of their assets; or

(b)   sell, transfer or otherwise dispose of the Borrowers, any of its subsidiaries and/or any of their assets; or

(c)   sell, transfer or otherwise dispose of any of the Borrowers' receivables or receivables of Group entities on recourse terms; or

(d)   enter into any arrangement under which money or the benefit of a bank or other account may be applied, set-off or made subject to a combination of accounts; or

(e)   enter into any other preferential arrangement having a similar effect,

11.5   Until the Loan has been repaid in full in accordance with Clause 7.1 above, the Borrower shall not (and the Guarantors shall provide that the Borrowers shall not):

(a)   declare, make or pay any dividend, charge, fee or other distribution (or interest on any unpaid dividend, charge, fee or other distribution) (whether in cash or in kind) on or in respect of its share capital (or any class of its share capital) or any additional paid in capital;

**YIH1/14**

(b)     pay or distribute any dividend or share premium reserve;

(c)     pay any management, advisory or other fee; or

(d)     redeem, purchase, defease, retire, reduce, cancel or repay any of its share capital or resolve to do so.

11.6    The Borrowers shall notify the Lender of any Event of Default (and the steps, if any, being taken to remedy it) promptly on becoming aware of its occurrence.

11.7    Each Borrower shall, at least thirty days prior to the Repayment Date, confirm to the Lender that either (i) it has procured Financial Indebtedness from a third party sufficient to fund its repayment obligations under Clause 6.1 above or (ii) that it otherwise through other sources of funding be able to meet its repayment obligations under Clause 6.1 on the Repayment Date.

11.8    The Obligors shall ensure that all funds advanced pursuant to this Loan Facility are used for the Activities, and shall not be used in any operations of Canadian Affiliates. Any claims, litigation or tax debt involving Canadian Affiliates shall be kept separated from the operations of the Borrower. The Obligors shall indemnify the Lender in full against any liability stemming from claims, litigation or tax debt involving Canadian Affiliates.

11.9    Each Borrower shall arrange within 10 Business Day that its insurance carrier shall pay, in the event of any claims under policies covering the Activities, any and all insurance proceeds into the Escrow Account up to and including all amounts due hereunder.

11.10   The Obligors shall grant the Lender 'observer status' at any and all board meetings held during the duration of this Agreement. The Lender shall have no voting power or influence at such meeting(s), but a representative of the Lender will be allowed to participate in the meeting(s) and discussions.

## 12.    EVENTS OF DEFAULT

12.1    Each of the following events or circumstances shall be an "**Event of Default**":

(a)     Any Obligor (or other entity within the Group) does not pay on the due date any amount payable pursuant to a Finance Document, including in particular interest, unless its failure to pay is due to an administrative or technical error and payment is made within three (3) Business days of the due date.

(b)     An Obligor (or other entity within the Group) does not comply with a term of any Finance Document (other than those referred to in Clause 12.1(a) above. No Event of Default under this clause will occur if the failure to

**YIH1/15**

comply is capable of remedy and is remedied within ten (10) Business Days of the earlier of (i) the Lender giving notice to the Borrowers or (ii) the relevant Obligor (or other entity within the Group) becoming aware of its failure to comply.

(c)     Any representation or statement made or deemed to be made by an Obligor (or other entity within the Group) in any Finance Document or any other document delivered by or on behalf of an Obligor (or other entity within the Group) under or in connection with any Finance Document is or proves to have been incorrect or misleading in any material respect when made or deemed to be made and such misrepresentation or misstatement, if capable of remedy, is not remedied promptly and in any event within 10 (ten) Business Days after the earlier of (i) the Lender giving written notice thereof to the Borrower or (ii) the relevant Obligor (or other entity within the Group) becoming aware of such misrepresentation or misstatement.

(d)     Any Financial Indebtedness of any Obligor (or other entity within the Group) is not paid when due nor within any originally applicable grace period or any Financial Indebtedness of any Obligor (or other entity within the Group) is declared to be or otherwise becomes due and payable prior to its specified maturity as a result of an event of default (however described).

(e)     Any of the following occurs in respect of any Obligor (or other entity within the Group):

     (i)     it is unable or admits inability to pay its debts as they fall due, suspends making payments on any of its debts or, by reason of actual or anticipated financial difficulties, commences negotiations with one or more of its creditors with a view to rescheduling any of its Financial Indebtedness; or

     (ii)     the value of the assets of its assets less than its liabilities (taking into account contingent and prospective liabilities); or

     (iii)     an Insolvency Event occurs.

(f)     Any of the following occurs in respect of any Obligor (or other entity within the Group):

     (i)     insolvency or similar proceedings are opened, or rejected for insufficiency of assets, by a court or other competent authoritative body;

**YIH1/16**

    (ii)    any event occurs which constitutes a reason to apply for the opening of insolvency or similar procedures;

    (iii)    any step is taken by that Obligor (or other entity within the Group) with a view to initiate moratorium, composition, assignment or similar arrangement with its creditors in general; or

    (iv)    the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of that Obligor (or other entity within the Group).

(g)    Any event (including any administrative, arbitration or litigation proceedings) occurs, which has a material adverse effect on any Obligor (or other entity within the Group) and, in the reasonable opinion of the Lender, is likely to affect the ability of that Obligor (or other entity within the Group) to perform its obligations under the Finance Documents to which it is a party.

(h)    The information provided by the Borrower about its legal and financial condition turns out to be untrue or incomplete in a material aspect.

(i)    Any Finance Document is not or ceases to be a legal, valid, binding and enforceable obligation of, or is repudiated by, any party thereto (other than the Lender) or, in the case of a Security Document ceases to create the requisite effective Security purported to be conferred by it or pursuant to it.

(j)    The Borrowers do not provide to the Lender the documents referred to in Section 8.4 above in the form, substance and time period provided therein, provided that Lender may consent, such consent not to be unreasonably withheld, to provide the Borrowers up to thirty (30) days to remedy.

(k)    The Borrowers and/or Obligors fail to perform any of the Undertakings provided in Section 11 above without prior written waiver from the Lender.

12.2    Upon the occurrence of an Event of Default that is continuing the Lender may declare that all or part of the Loan, together with accrued interest, and all other amounts accrued or outstanding under the Finance Documents be immediately due and payable, whereupon they shall become immediately due and payable.

## 13.    INDEMNITY

**YIH1/17**

13.1   The Lender shall not be liable for any loss or damage suffered by the Borrowers and/or Guarantors save in respect of such loss or damage which is suffered as a result of the willful misconduct or gross negligence of the Lender.

13.2   The Borrowers will indemnify, and the Guarantors shall guarantee such indemnity of, the Lender against any and all losses and damages which may be incurred by the Lender for anything done or omitted in the exercise or purported exercise of the powers contained in any Finance Document and occasioned by any breach of the Obligors of any of their obligations or undertakings herein contained other than to the extent that such losses and damages are incurred by or made against the Lender as a result of the gross negligence or wilful misconduct of the Lender.

## 14.   COSTS AND EXPENSES

14.1   The Borrowers shall pay all legal costs and expenses resulting from the preparation of this Agreement.

14.2   The Borrowers shall pay all legal costs and expenses resulting from the enforcement of this Agreement.

## 15.   PARTIAL INVALIDITY

If, at any time, any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired. The illegal, invalid or unenforceable provision shall be deemed replaced by such provision reflecting the same commercial intent of the parties which provision shall be legal, valid and enforceable in the relevant jurisdiction. This also applies in the event of gaps in the documentation.

## 16.   REMEDIES AND WAIVERS

No failure to exercise, nor any delay in exercising, on the part of the Lender, any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise thereof or the exercise of any other right or remedy. The rights and remedies provided hereunder are cumulative and not exclusive of any rights or remedies provided by law.

## 17.   AMENDMENTS

Changes and amendments to this Agreement, including this Clause 17 (Amendments), shall be made in writing, unless notarial form by operation of

**YIH1/18**

law is required. The parties may waive this form requirement by written agreement only. No oral supplements to this Agreement have been made.

## 18.  ASSIGNMENTS

18.1  No Obligor may assign or transfer all or any part of its rights, obligations or benefits under this Agreement or any other Finance Document.

18 2  The Lender may:

    (a)  assign any of its rights; or

    (b)  transfer by novation any of its rights and obligations,

to any other person and the Obligors shall execute all documents which the Lender may reasonably require to give effect to an assignment or novation.

## 19.  NOTICES AND LANGUAGE

19.1  All notices and communications under or in connection with this Agreement shall be in writing and shall be delivered by letter, posted or delivered by hand, or fax. Each notice or communication shall be given to the relevant party at the address or fax number and marked for the attention of the person(s) or department notified in writing by that party to the other at least ten (10) Business Days in advance. The initial address, fax number and person(s) or department so specified by each party are set out below:

| To the First Borrower: | **Einer Energy SARL** | |
|---|---|---|
| | Address: | 1B Heienhaff, L-1736 Senningerberg, Luxembourg |
| | Fax: | +41 79 848 2841 |
| | Attention: | Alexander Lubawin |
| To the Second Borrower: | **Uniol SA** | |
| | Address: | Øraveien 2, 1630 Gamle Fredrikstad, Norway |
| | Fax: | [*insert details*] |
| | Attention: | [*insert name*] |
| To the Lender: | **East Guardian Real Property Segregated Portfolio** | |

|  | Address: c/o   East   Guardian   Asset Management AG |
|--|--|

Universitatsstrasse 100

CH-8006 Zurich, Switzerland

Fax:        +41 44 350 1456

Attention:   Mr Erik Wigertz

To Mazur:        32 Stratheden Road

Toronto, Ontario, Canada, M4N 1E4.

Fax:        416-969-9190

Attention:   Arie Mazur

To Lutsenko:        M. Novopeskovski 8-36

Moscow. 121099. Russian Federation

Fax:        +74 95 956 9491

Attention:   Constantin Lutsenko

19.2    All notices and communications under or in connection with this Agreement will only be effective:

(a)    if by way of fax, when received in legible form; or

(b)    if by way of letter, when it has been left at the relevant address,

and, if a particular department or officer is specified as part of its address details provided under this Clause 18 (Notices and Language), if addressed to that department or officer provided that a notice given in accordance with the above but received on a day which is not a Business Day or after normal business hours in the place of receipt shall be deemed to have been received on the next Business Day.

19.3    Any notice or other communication under or in connection with this Agreement shall be in the English language or, if in any other language, accompanied by a translation into English.

## 20.    COUNTERPARTS

1303133 27656796 519

**YIH1/20**

This Agreement may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

## 21.   ENTIRE AGREEMENT

The Parties agree that this Agreement constitutes the entire agreement between them with respect to the Loan, and supersedes all previous drafts, agreements, arrangements and understandings between them, whether oral or written.

## 22.   APPLICABLE LAW AND JURISDICTION

22.1   This Agreement and all non-contractual obligations arising out of or in connection with it are governed by the laws of England and Wales without reference to its conflict of laws principles.

22.2   In the event of a dispute arising of or relating to this contract, including any question regarding its existence, validity or termination, the dispute shall be referred to an finally resolved by arbitration under the LCIA rules, which rules are deemed to be incorporated by reference into this clause. The language to be used in the mediation and in the arbitration shall be English. The Arbitral Tribunal shall consist of one arbitrator who shall be an English Lawyer of at least ten years standing and be appointed by the LCIA.  The Parties hereto hereby submit to the exclusive jurisdiction of the LCIA.  Any judgment shall be final and binding upon the Parties as to the subject matter decided.

22.3   Without prejudice to any other mode of service, the Obligors:

(a)   Will appoint an agent within 60 days as their agent for service of process in relation to any proceedings before the English courts in connection with the Finance Documents to which it is a party and agrees to deliver a notice of acceptance of such appointment to the Lender;

(b)   agree to maintain such an agent for service of process in England for so long as any amount is outstanding under the Finance Documents;

(c)   agree that failure by a process agent to notify the Obligor of the process will not invalidate the proceedings concerned;

(d)   consent to the service of process relating to any such proceedings by prepaid posting of a copy of the process to its address for the time being applying under Clause 16 (Notices); and

(e)   agree that if the appointment of any person mentioned in this Clause 22.3 ceases to be effective, the relevant Obligor(s) shall immediately:

**YIH1/21**

    (i)      appoint a further person in England to accept service of process on its behalf in England and;

    (ii)     notify the Lender of such appointment and, failing such appointment and notification within 15 days, the Lender is entitled to appoint such a person by notice to the Obligor.

**This Agreement has been entered into on the date stated at the beginning of this Agreement.**

**YIH1/22**

Execution Page
Loan Agreement

**East Guardian SPC, East Guardian Real Property Segregated Portfolio**
**as Lender**

By: _____

Name:        Mr. Erik Wigertz

Title:        Director

**Einer Energy SARL**
**as First Borrower**

By: _____          By: _____

Name:        Mr. Arie Mazur             Name:        Mr. Constantin Lutsenko

Title:        Director                  Title:        Director

**Uniol AS**
**as Second Borrower**

By: _____          By: _____

Name:        [insert name]              Name:        [insert name]

Title:        Director                  Title:        Director

**Arie Mazur**
**as Guarantor**

By: _____

Name:        Mr Arie Mazur

1303133 27656796.522

**YIH1/23**

**Constantin Lutsenko**

**as Guarantor**

By: _____

Name:        Mr. Constantin Lutsenko

**YIH1/24**

DATE    FEBRUARY 24, 2014

EAST GUARDIAN SPC on behalf of the East Guardian Asset and Trade Finance Fund SP

as Lender

and

NORTH SEA BIODIESEL

as First Borrower

and

EINER ENERGY SARLEINER ENERGY SARL

as Second Borrower

and

ARIE MAZUR

and

CONSTANTIN LUTSENKO

as Guarantors

---

USD 3,500,000

LOAN AGREEMENT

---

**YIH1/25**

TABLE OF CONTENTS

CLAUSE                                                                                    PAGE

1.      Definitions and Interpretation ............................................................................3

2.      Loan Facility..........................................................................................................6

3.      Payment and Calculation of Interest on Loan....................................................7

4.      Taxes.....................................................................................................................7

5.      Tax Payments.......................................................................................................8

6.      Third Party Claims ...............................................................................................8

7.      Repayment of Loan..............................................................................................9

8.      Reporting ..............................................................................................................9

9.      Representations and warranties.........................................................................9

10.     Undertakings......................................................................................................10

11.     Events of Default ...............................................................................................12

12.     Indemnity ............................................................................................................14

13.     Costs and Expenses .........................................................................................14

14.     Partial Invalidity..................................................................................................14

15.     Remedies and Waivers......................................................................................14

16.     Amendments.......................................................................................................15

17.     Assignments .......................................................................................................15

18.     Notices and Language .......................................................................................15

19.     Counterparts.......................................................................................................16

20.     Entire Agreement ...............................................................................................17

21.     Applicable Law and Jurisdiction .......................................................................17

**YIH1/26**

This **Agreement** is made on                                         2014

Parties

East Guardian SPC, on behalf of the East Guardian Asset and Trade Finance Fund SP a
company limited by shares, established under the laws of The Cayman Islands, with address at
c/o Maples Corporate Services Ltd., P.O. Box 309, Ugland House, South Church Street, Grand
Cayman KY1-1104, Cayman Islands (the "**Lender**");

(1)     **North Sea Biodiesel**, a Norwegian private limited company (*aksjeselskap*) organized
        and existing under the laws of Norway, with its registered office at Øraveien 2, 1630
        Gamle Fredrikstad, Norway, registered with the Norwegian Registry of Enterprises
        under registration number 990 154 848 (the "**First Borrower**");

(2)     **Einer Energy SARL**, a company incorporated under the laws of Luxembourg, having
        registration number B154463 and its registered address at 1B Heienhaff, L-1736
        Senningerberg, Luxembourg (the "**Second Borrower**");

        (the First Borrower and the Second Borrower together, the "**Borrowers**" and each a
        "**Borrower**")

(3)     **Arie Mazur**, a national of Canada residing at 50 Lawrence Crescent, Toronto, Ontario,
        Canada, M4N 1N2 ("**Mazur**"); and

(4)     **Constantin Lutsenko**, a national of Russia residing at M. Novopeskovski 8-36
        Moscow. 121099. Russian Federation ("**Lutsenko**")

        (Mazur and Lutsenko hereinafter referred to as "**Guarantor**" or "**Guarantors**"
        depending on context, and Guarantors, Borrower and Lender together hereinafter
        referred to as the "**Parties**").

WHEREAS:

(A)     The Lender is willing to advance hereunder to the Borrower a total amount of USD
        3,500,000 (Three Million Five Hundred Thousand United States Dollars even) for the
        continuing purpose of financing the Borrowers business activities, specifically the
        purchase of raw materials for refining into soya bean oil in Norway, and transportation
        and sale to pre-agreed customers on the local Norweigen market (the "**Activities**").

(B)     The Parties have entered into this Agreement in order to document the terms governing
        the secured term loan to be made by the Lender to the Borrower in order to finance the
        Activities.

(C)     It is agreed that the Borrower will use funds only to prepay for deliveries of raw material
        from Cargill (full title) to be delivered to North Sea Biodiesel and then sold to agreed
        offtakers as well as the North Sea Biodiesel processing fee. At time of signing these
        offtakers will be limited to Shell and Esso for the local Norwegian market.

**YIH1/27**

**IT IS AGREED** as follows:

1.      **DEFINITIONS AND INTERPRETATION**

    1.1      In this Agreement:

"**Activities**" has the meaning given to such term in Recital (A).

"**Assignment of Proceeds**" means an Assignment of Proceeds given by Borrower in favor of Lender this day, attached hereto as Attachment A, and/or future such documents in similar form, substance and intent.

"**Assignment of Title**" means a Declaration of Charge and Assignment of Title given by Borrower in favor of Lender this day, attached hereto as Attachment B, and/or future such documents in similar form, substance and intent.

"**Business Day**" means a day on which banks are open for business in both England and Wales and Luxembourg and Norway and for the avoidance of doubt shall not include Saturdays, Sundays, bank and public holidays in these places.

"**Canadian Affiliates**" means Einer Canada Inc., with offices at 1200 Bay Street, Suite 202, Toronto, Ontario, Canada, M5R 2A5, and Great Lakes Biodiesel Inc., with offices at 77 Bloor Street West, Suite 1200, Toronto, Ontario, Canada, M5S 1M2.

"**Continuing**" means that an Event of Default has not been remedied or waived.

"**Default Rate**" has the meaning given to such term in Clause 3.5.

"**Disbursement Date**" means the date on which a disbursement of the Loan is made (in whole or in part) pursuant to this Agreement.

"**Escrow Account**" has the meaning given to such term in Clause 2.2.

"**Event of Default**" means any one of the events specified in Clause 11 (Events of Default) hereof.

"**Finance Documents**" means this Agreement, the Security Documents, and any other document designated as a "Finance Document" by the Borrower and the Lender.

"**Financial Indebtedness**" means any indebtedness for or in respect of:

(a)      moneys borrowed;

(b)      any amount raised by acceptance under any acceptance credit facility or dematerialised equivalent;

**YIH1/28**

(c)     any amount raised pursuant to any note purchase facility or the issue of bonds, notes, debentures, loan stock or any similar instrument;

(d)     the amount of any liability in respect of any lease or hire purchase contract which would, in accordance with generally accepted accounting principles of the Borrower' jurisdictions of incorporation, be treated as a finance or capital lease;

(e)     receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis);

(f)     any amount raised under any other transaction (including any forward sale or purchase agreement) having the commercial effect of a borrowing;

(g)     any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price (and, when calculating the value of any derivative transaction, only the marked to market value shall be taken into account);

(h)     any counter-indemnity obligation in respect of a guarantee, indemnity, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution; and

(i)     the amount of any liability in respect of any guarantee or indemnity for any of the items referred to in paragraphs (a) to (h) above.

"**Group**" means the Borrower and each of their Subsidiaries from time to time.

"**Insolvency Event**" means any one or more of the following in relation to any person:

(a)     it is unable to pay its debts as they fall due; or

(b)     the value of its liabilities (including its contingent and prospective liabilities) exceeds the value of its assets; or

(c)     it fails to comply with any actions and/or requirements under the companies' and insolvency laws of Luxembourg as provided in the Addendum to this Agreement; or

(d)     execution or other process issued on a judgment, decree or order of a court in favour of a creditor of it is returned wholly or partly unsatisfied; or

(e)     it has taken any action or steps have been taken or legal proceedings have been started or threatened against it for (i) its winding up, liquidation, administration, dissolution, amalgamation, reconstruction, reorganisation, arrangement, adjustment, consolidation or protection or relief of creditors (whether by way of voluntary arrangement, scheme of arrangement or otherwise), or (ii) the enforcement of any security interest over any or all of its assets; or (iii) the appointment of a liquidator, receiver, controller, inspector,

**YIH1/29**

manager, supervisor, administrative receiver, administrator, trustee or similar officer or official of it or of any or all of its assets; or

(f)      it is, in any jurisdiction, subject to or threatened by any actions, steps, procedures or other proceedings under any applicable bankruptcy, insolvency, rehabilitation or other reorganisation laws; or

(g)      any actions, steps, procedures or other proceedings equivalent or analogous to any of those set out in any of (a) to (f) above (inclusive) of this definition have been taken, started or threatened against it in any jurisdiction, including the seeking by it (or any other person in relation to it) of winding up, liquidation, administration, dissolution, amalgamation, reconstruction, reorganisation, arrangement, adjustment, consolidation or protection or relief of creditors.

"**Interest Payment Date**" means the 22nd calendar day of each month (or if that day is not a Business Day the first Business Day thereafter).

"**Loan**" has the meaning given to such term in Clause 2.1.

"**Obligor**" means each Borrower and each Guarantor.

"**Material Adverse Effect**" has the meaning given to such term in Clause 11.1(g) (Termination due to Events of Default).

"**Repayment Date**" has the meaning given to such term in Clause 7.1 (Repayment of Loan).

"**Revolving Account**" shall mean North Sea Biodiesel BNP Paribas (Suisse) SA Geneva bank account No. 89667/1L, IBAN CH 3208686001089667001, Swift Code: BPPBCHGG, into which Borrower shall have the right to make interim repayments in an amount of not less than [USD 1,000,000 (One Million United States dollars even)] per repayment at any time before the Repayment Date, and out of which the Borrower shall have the right to request interim drawdowns up until 30 (thirty) days before the Repayment Date.

"**Security Documents**" shall mean the Assignment of Proceeds and the Assignment of Title and other documents as may be agreed between the Parties.

"**Subsidiary**" means a subsidiary within the meaning of section 1159 of the Companies Act 2006.

1.2      Unless otherwise indicated herein, any reference to the plural includes the singular and any reference to the singular includes the plural.

1.3      A reference to a Finance Document or any other agreement or instrument is a reference to that Finance Document or other agreement or instrument as amended, novated, supplemented, extended or restated.

**YIH1/30**

1.4     Unless expressly provided to the contrary in this Agreement, the "**Borrower**", the "**Lender**", any "**Obligor**", any "**Party**" or any other person shall be construed so as to include its successors in title, permitted assigns and permitted transferees

1.5     Unless expressly provided to the contrary in this Agreement, a person who is not a party to this Agreement may not enforce any of its terms under the concept of a contract for the benefit of a third party and, notwithstanding any term of this Agreement, no consent of any third party is required for any variation (including any release or compromise of any liability) or termination of this Agreement.

1.6     Any reference in this Agreement to a "**Clause**" or a "**Schedule**" shall, subject to any contrary indication, be construed as a reference to a clause or a schedule hereof.

2.     **LOAN FACILITY**

2.1     The Lender shall make available on the date of this Agreement to the Borrower a loan facility (the "**Loan**") in the amount of USD 3,500,000 (three Million Five Hundred Thousand United States Dollars), upon the terms and conditions of this Agreement.

2.2     All amounts advanced to the Borrower pursuant to this Loan Facility shall be to the Borrowers current account (the "**Escrow Account**"), unless otherwise agreed in writing by both the Borrower and the Lender.

2.3     The Lender shall have full access to the Escrow Account records.

2.4     Each amount advanced pursuant to this Loan Facility shall require the Borrower to provide the additional security provided for in the Assignment of Title and Assignment of Proceeds documents, in the form and substance as set forth in Schedule A to this Agreement.

2.5     The drawdown period for advances under this Loan Facility shall be up to 45 (forty five) calendar days.  Requests for funding shall be in writing, by letter or email.

2.6     All sales revenues of the Borrower shall be deposited in the Escrow Account and notified to the Lender within 5 days of each deposit, unless otherwise agreed in writing by each of the Borrower and the Lender.

2.7     The Borrower shall apply all amounts borrowed under this Agreement towards financing the Activities.

2.8     The Lender is not obliged to monitor or verify how any amount borrowed under this Agreement is used but retains all rights hereunder and by action of applicable law to demand and receive full information as to use of funds from the effective date hereof through the date of such demand.

**YIH1/31**

3.    **PAYMENT AND CALCULATION OF INTEREST ON LOAN**

3.1    In addition to the interest payable pursuant to Clause 3.3 below, from (and including) the Disbursement Date until (and including) the day prior to the Repayment Date the Borrower undertake to pay to the Lender on each Interest Payment Date a fee equal to [7] per cent per annum on the total undisbursed portion of the Loan or in the Revolving Account in excess of USD 250,000.00(two hundred and fifty thousadUnited States Dollars even).

3.2    The Borrower undertake to pay to the Lender interest on all amounts advanced on the Loan from (and including) the Disbursement Date until (and including) the day prior to the Repayment Date at 15 per cent per annum.

3.3    Any interest shall accrue on a day-to-day basis, calculated according to the actual number of days elapsed and a year of 360 days.

3.4    The Borrower shall pay accrued interest on the Loan on every Interest Payment Date and on the Repayment Date.

3.5    If the Borrower does not pay any sum they are obliged to pay under the Finance Documents when it is due, the Borrower shall pay interest on that unpaid amount from time to time outstanding at the rate per annum which is 2% higher than the rate of interest specified under Clause 3.2 (the "**Default Rate**"), for the period beginning on its due date and ending on the date the Lender receives it, both before and after judgment.

4.    **TAXES**

4.1    All payments to be made by any Obligor hereunder shall be made free and clear of and without deduction for or on account of tax unless the Obligor is required to make such a payment subject to the deduction or withholding of tax, in which case the sum payable by the Obligor (in respect of which such deduction or withholding is required to be made) shall be increased to the extent necessary to ensure that the Lender receives a sum net of any deduction or withholding equal to the sum which it would have received if no such deduction or withholding had been made or required to be made. The Lender and the Obligor shall, upon written request of the Obligor specifying the action required by the Lender, co-operate in completing procedural formalities necessary for the Obligor to obtain authorization to make payments without a tax deduction.

4.2    Without prejudice to Clause 4.1 (Taxes), if the Lender is required to make any payment of or on account of tax on or in relation to any sum received or receivable hereunder (including any sum deemed for purposes of tax to be received or receivable by the Lender whether or not actually received or receivable) or if any liability in respect of any such payment is asserted, imposed, levied or assessed on or against the Lender, the Borrower shall, upon demand of the Lender, promptly indemnify the Lender against such payment or liability, together with any interest, penalties, costs and expenses payable or

**YIH1/32**

incurred in connection therewith, provided that this Clause 4.2 (Taxes) shall not apply to any tax imposed on and calculated by reference to the net income actually received or receivable by the Lender by the jurisdiction in which the Lender is incorporated.

4.3    If the Lender intends to make a claim pursuant to Clause 4.2 (Taxes), it shall notify the relevant Obligor(s) in writing in reasonable detail of the event giving rise to the claim and of the basis of calculation of such claim, provided that the Lender shall not be required to disclose any confidential information relating to the organization of its affairs.

5.    **TAX PAYMENTS**

5.1    If, at any time, any Obligor is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Obligor shall promptly notify the Lender.

5.2    If any Obligor makes any payment hereunder in respect of which it is required to make any deduction or withholding, it shall pay the full amount required to be deducted or withheld to the relevant taxation or other authority within the time allowed for such payment under applicable law and shall deliver to the Lender, within thirty (30) days after it has made such payment to the applicable authority, an original receipt (or a certified copy thereof) issued by such authority evidencing the payment to such authority of all amounts so required to be deducted or withheld.

5.3    No provision of this Agreement shall interfere with the right of the Lender to arrange its tax or any other affairs in whatever manner it thinks fit, oblige the Lender to claim any credit, relief, remission or repayment in respect of any payment under Clause 4 (Taxes) nor oblige the Lender to disclose any information relating to its tax or other affairs or any computations in respect thereof.

6.    **THIRD PARTY CLAIMS**

6.1    Any sums advanced hereunder by the Lender to the Borrower shall not be used for the payment of any claims (whether pre-existing or arising hereafter) against any Obligor or the Group by third parties.

6.2    If any Obligor is required to make any payment of or on account of any such claims or if any liability in respect of any such claims is asserted, imposed, levied or assessed on or against the Obligor, the Obligor shall ensure that no funds advanced by or assigned to the Lender are used in satisfaction of such claims, upon demand of the Lender, promptly indemnify the Lender against such payments or liability, together with any interest, penalties, costs and expenses payable or incurred in connection therewith by the Lender.

**YIH1/33**

7.  **REPAYMENT OF LOAN**

7.1  The Borrower shall, and the Guarantors shall ensure that the Borrower shall, repay the Loan in full, together with all remaining interest accrued thereon and not paid on any previous Interest Payment Date, on the date falling 12 months from the date of this Agreement (the "**Repayment Date**").

7.2  No amount repaid pursuant to this Clause may be re-borrowed unless otherwise agreed in writing by the Lender.

7.3  All payments to be made under this Agreement shall be calculated and made without (and free and clear of any deduction for) set-off or counterclaim.

8.  **REPORTING**

8.1  The Borrower shall provide weekly reports to the Lender, in form and substance acceptable to the Lender, as to the status of their operations and accounts, such report to also contain a summary of anticipated drawdown requests to be submitted to the Lender pursuant to this Agreement in the forthcoming 30 to 60 day period.

8.2  All shipping documents shall be endorsed, notified or confirmed to the Lender at the preference of the Lender.

8.3  Within seven days of submission or receipt (as applicable), copies of invoices for each sale made by the Borrower to end purchasers and the corresponding confirmation of receipt of funds shall be sent by the Borrower to the Lender.

8.4  Upon request of the Lender, the Borrower shall provide at their own expense:

(a)  reports from SGS/Inchape or such other a third party surveyor acceptable to the Lender, including the receipt of product, its quantity and quality;

(b)  monthly management accounts in form and substance acceptable to the Lender together with copies of audited accounts that are compliant with reporting requirements applicable in Luxembourg; and

8.5  The Borrower hereby expressly agree that failure to provide any of such documents in the form, substance and time provided shall constitute an Event of Default for purposes of this Agreement.

9.  **REPRESENTATIONS AND WARRANTIES**

9.1  The Obligors make the representations and warranties set out in this Clause 9 (Representations) to the Lender on the date of this Agreement. The Obligors will be deemed to repeat the representations and warranties set out in this Clause 9 (Representations) every day until the Repayment Date. The Obligors acknowledge that the Lender has entered into this Agreement in reliance on

**YIH1/34**

and in consideration for these representations and warranties and that the Obligors shall be jointly and severally liable to the Lender for any failure thereof.

9.2    The First Borrower is a company duly incorporated, validly existing and in good standing under the laws of Norway.

9.3    The Second Borrower is a company duly incorporated, validly existing and in good standing under the laws of Luxembourg.

9.4    The Obligors have the power to enter into, perform and deliver, and have taken all necessary action to authorize their entry into, performance and delivery of, this Agreement and the transactions contemplated thereby.

9.5    The entry into, performance and the transactions contemplated by this Agreement does not and will not conflict with: any law or regulation applicable to the Obligors; the Borrower's constitutional documents; or any agreement or instrument binding upon the Obligors or any of their assets.

9.6    The obligations expressed to be assumed by them in this Agreement are legal, valid, binding and enforceable obligations.

9.7    No Event of Default has occurred and is Continuing or might reasonably be expected to result from the making of the Loan or the entry into, the performance or, or any transaction contemplated by, any Finance Document.

9.8    No litigation, arbitration or administrative proceedings of or before any court, arbitral body or agency have (to the best of its knowledge and belief) been started or threatened against the Obligors, jointly or severally.

9.9    The Borrower have not incurred any outstanding Financial Indebtedness other than the Financial Indebtedness governed by this Agreement.

10.    **UNDERTAKINGS**

10.1    The Obligors shall procure that within 10 working days on the date of this Agreement the Guarantors provide the Lender with duly executed copies of the Security Documents.

10.2    The Obligors and Group entities shall comply in all respects with all laws to which they may be subject.

10.3    The Borrower shall not (and the Borrower shall procure that no member of the Group will), without the Lender's prior written consent, incur or allow to remain outstanding any Financial Indebtedness other than Financial Indebtedness incurred under this Agreement.

10.4    The Obligors shall not:

   (a)    create, or permit to subsist, any Security on or over the Borrowers, Group entities or any of their assets; or

**YIH1/35**

    (b)      sell, transfer or otherwise dispose of the Borrowers, any of its subsidiaries and/or any of their assets; or

    (c)      sell, transfer or otherwise dispose of any of the Borrowers receivables or receivables of Group entities on recourse terms; or

    (d)      enter into any arrangement under which money or the benefit of a bank or other account may be applied, set-off or made subject to a combination of accounts; or

    (e)      enter into any other preferential arrangement having a similar effect,

10.5    Until the Loan has been repaid in full in accordance with Clause 7.1 above, the Borrower shall not (and the Guarantors shall provide that the Borrower shall not):

    (a)      declare, make or pay any dividend, charge, fee or other distribution (or interest on any unpaid dividend, charge, fee or other distribution) (whether in cash or in kind) on or in respect of its share capital (or any class of its share capital) or any additional paid in capital;

    (b)      pay or distribute any dividend or share premium reserve;

    (c)      pay any management, advisory or other fee; or

    (d)      redeem, purchase, defease, retire, reduce, cancel or repay any of its share capital or resolve to do so.

10.6    The Borrower shall notify the Lender of any Event of Default (and the steps, if any, being taken to remedy it) promptly on becoming aware of its occurrence.

10.7    Each Borrower shall, at least thirty days prior to the Repayment Date, confirm to the Lender that either (i) it has procured Financial Indebtedness from a third party sufficient to fund its repayment obligations under Clause 6.1 above or (ii) that it otherwise through other sources of funding be able to meet its repayment obligations under Clause 6.1 on the Repayment Date.

10.8    The Obligors shall ensure that all funds advanced pursuant to this Loan Facility are used for the Activities, and shall not be used in any operations of Canadian Affiliates.  Any claims, litigation or tax debt involving Canadian Affiliates shall be kept separated from the operations of the Borrower. The Obligors shall indemnify the Lender in full against any liability stemming from claims, litigation or tax debt involving Canadian Affiliates.

10.9    Each Borrower shall arrange within 10 Business Day that its insurance carrier shall pay, in the event of any claims under policies covering the Activities, any and all insurance proceeds into the Escrow Account up to and including all amounts due hereunder.

**YIH1/36**

10.10   The Obligors shall grant the Lender 'observer status' at any and all board meetings held during the duration of this Agreement. The Lender shall have no voting power or influence at such meeting(s), but a representative of the Lender will be allowed to participate in the meeting(s) and discussions.

11.   **EVENTS OF DEFAULT**

11.1   Each of the following events or circumstances shall be an "**Event of Default**":

(a)   Any Obligor (or other entity within the Group) does not pay on the due date any amount payable pursuant to a Finance Document, including in particular interest, unless its failure to pay is due to an administrative or technical error and payment is made within three (3) Business days of the due date.

(b)   An Obligor (or other entity within the Group) does not comply with a term of any Finance Document (other than those referred to in Clause 11.1(a) above. No Event of Default under this clause will occur if the failure to comply is capable of remedy and is remedied within ten (10) Business Days of the earlier of (i) the Lender giving notice to the Borrower or (ii) the relevant Obligor  (or other entity within the Group) becoming aware of its failure to comply.

(c)   Any representation or statement made or deemed to be made by an Obligor  (or other entity within the Group) in any Finance Document or any other document delivered by or on behalf of an Obligor  (or other entity within the Group) under or in connection with any Finance Document is or proves to have been incorrect or misleading in any material respect when made or deemed to be made and such misrepresentation or misstatement, if capable of remedy, is not remedied promptly and in any event within 10 (ten) Business Days after the earlier of (i) the Lender giving written notice thereof to the Borrower or (ii) the relevant Obligor  (or other entity within the Group) becoming aware of such misrepresentation or misstatement.

(d)   Any Financial Indebtedness of any Obligor (or other entity within the Group) is not paid when due nor within any originally applicable grace period or any Financial Indebtedness of any Obligor (or other entity within the Group) is declared to be or otherwise becomes due and payable prior to its specified maturity as a result of an event of default (however described).

(e)   Any of the following occurs in respect of any Obligor (or other entity within the Group):

(1)   it is unable or admits inability to pay its debts as they fall due, suspends making payments on any of its debts or, by reason of actual or anticipated financial difficulties, commences

**YIH1/37**

negotiations with one or more of its creditors with a view to rescheduling any of its Financial Indebtedness; or

(2)    the value of the assets of its assets less than its liabilities (taking into account contingent and prospective liabilities); or

(3)    an Insolvency Event occurs.

(f)    Any of the following occurs in respect of any Obligor (or other entity within the Group):

(1)    insolvency or similar proceedings are opened, or rejected for insufficiency of assets, by a court or other competent authoritative body;

(2)    any event occurs which constitutes a reason to apply for the opening of insolvency or similar procedures;

(3)    any step is taken by that Obligor (or other entity within the Group) with a view to initiate moratorium, composition, assignment or similar arrangement with its creditors in general; or

(4)    the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of that Obligor (or other entity within the Group).

(g)    Any event (including any administrative, arbitration or litigation proceedings) occurs, which has a material adverse effect on any Obligor (or other entity within the Group) and, in the reasonable opinion of the Lender, is likely to affect the ability of that Obligor (or other entity within the Group) to perform its obligations under the Finance Documents to which it is a party.

(h)    The information provided by the Borrower about its legal and financial condition turns out to be untrue or incomplete in a material aspect.

(i)    Any Finance Document is not or ceases to be a legal, valid, binding and enforceable obligation of, or is repudiated by, any party thereto (other than the Lender) or, in the case of a Security Document ceases to create the requisite effective Security purported to be conferred by it or pursuant to it.

(j)    The Borrower does not provide to the Lender the documents referred to in Clause 8.4 above in the form, substance and time period provided therein, provided that Lender may consent, such consent not to be unreasonably withheld, to provide the Borrower up to thirty (30) days to remedy.

**YIH1/38**

      (k)      The Borrower and/or Obligors fail to perform any of the Undertakings provided in Clause 10 above without prior written waiver from the Lender.

11.2    Upon the occurrence of an Event of Default that is continuing the Lender may declare that all or part of the Loan, together with accrued interest, and all other amounts accrued or outstanding under the Finance Documents be immediately due and payable, whereupon they shall become immediately due and payable.

## 12.    INDEMNITY

12.1    The Lender shall not be liable for any loss or damage suffered by the Borrower and/or Guarantors save in respect of such loss or damage which is suffered as a result of the willful misconduct or gross negligence of the Lender.

12.2    The Borrower will indemnify, and the Guarantors shall guarantee such indemnity of, the Lender against any and all losses and damages which may be incurred by the Lender for anything done or omitted in the exercise or purported exercise of the powers contained in any Finance Document and occasioned by any breach of the Obligors of any of their obligations or undertakings herein contained other than to the extent that such losses and damages are incurred by or made against the Lender as a result of the gross negligence or wilful misconduct of the Lender.

## 13.    COSTS AND EXPENSES

13.1    The Borrower shall pay all legal costs and expenses resulting from the preparation of this Agreement.

13.2    The Borrower shall pay all legal costs and expenses resulting from the enforcement of this Agreement.

## 14.    PARTIAL INVALIDITY

If, at any time, any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired. The illegal, invalid or unenforceable provision shall be deemed replaced by such provision reflecting the same commercial intent of the parties which provision shall be legal, valid and enforceable in the relevant jurisdiction. This also applies in the event of gaps in the documentation.

## 15.    REMEDIES AND WAIVERS

No failure to exercise, nor any delay in exercising, on the part of the Lender, any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise thereof or the exercise of any other right or remedy. The rights and remedies provided hereunder are cumulative and not exclusive of any rights or remedies provided by law.

**YIH1/39**

16.   **AMENDMENTS**

Changes and amendments to this Agreement, including this Clause 16 (Amendments), shall be made in writing, unless notarial form by operation of law is required. The parties may waive this form requirement by written agreement only. No oral supplements to this Agreement have been made.

17.   **ASSIGNMENTS**

17.1   No Obligor may assign or transfer all or any part of its rights, obligations or benefits under this Agreement or any other Finance Document.

17.2   The Lender may:

(a)   assign any of its rights; or

(b)   transfer by novation any of its rights and obligations,

to any other person and the Obligors shall execute all documents which the Lender may reasonably require to give effect to an assignment or novation.

18.   **NOTICES AND LANGUAGE**

18.1   All notices and communications under or in connection with this Agreement shall be in writing and shall be delivered by letter, posted or delivered by hand, or fax. Each notice or communication shall be given to the relevant party at the address or fax number and marked for the attention of the person(s) or department notified in writing by that party to the other at least ten (10) Business Days in advance. The initial address, fax number and person(s) or department so specified by each party are set out below:

| | |
|---|---|
| To the Borrower: | **North Sea Biodiesel** |
| | Address:   Øraveien 2, 1630 Gamle Fredrikstad, Norway |
| | Fax:   [*insert details*] |
| | Attention:   Carl Ivar Herskedel |
| To the Second Borrower: | **Einer Energy SARL** |
| | Address:   1B Heienhaff, L-1736 Senningerberg, Luxembourg |
| | Fax:   +41 79 848 2841 |
| | Attention:   Alexander Lubawin |
| To the Lender: | **East Guardian Real Property Segregated Portfolio** |

**YIH1/40**

|  | Address: | c/o East Guardian Asset Management AG |
|--|--|--|
|  |  | Universitatsstrasse 100 |
|  |  | CH-8006 Zurich, Switzerland |
|  | Fax: | +41 44 350 1456 |
|  | Attention: | Mr Erik Wigertz |
| To Mazur: |  | 50 Lawrence Crescent |
|  |  | Toronto, Ontario, Canada, M4N 1N2 |
|  | Fax: | 416-969-9190 |
|  | Attention: | Arie Mazur |
| To Lutsenko: |  | M. Novopeskovski 8-36 |
|  |  | Moscow. 121099. Russian Federation |
|  | Fax: | +74 95 956 9491 |
|  | Attention: | Constantin Lutsenko |

18.2   All notices and communications under or in connection with this Agreement will only be effective:

(a)     if by way of fax, when received in legible form; or

(b)     if by way of letter, when it has been left at the relevant address,

and, if a particular department or officer is specified as part of its address details provided under this Clause 18 (Notices and Language), if addressed to that department or officer provided that a notice given in accordance with the above but received on a day which is not a Business Day or after normal business hours in the place of receipt shall be deemed to have been received on the next Business Day.

18.3   Any notice or other communication under or in connection with this Agreement shall be in the English language or, if in any other language, accompanied by a translation into English.

19.   **COUNTERPARTS**

This Agreement may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

**YIH1/41**

20.   ENTIRE AGREEMENT

The Parties agree that this Agreement constitutes the entire agreement between them with respect to the Loan, and supersedes all previous drafts, agreements, arrangements and understandings between them, whether oral or written.

21.   APPLICABLE LAW AND JURISDICTION

21.1   This Agreement and all non-contractual obligations arising out of or in connection with it are governed by the laws of England and Wales without reference to its conflict of laws principles.

21.2   In the event of a dispute arising of or relating to this contract, including any question regarding its existence, validity or termination, the dispute shall be referred to an finally resolved by arbitration under the LCIA rules, which rules are deemed to be incorporated by reference into this clause.  The language to be used in the mediation and in the arbitration shall be English. The Arbitral Tribunal shall consist of one arbitrator who shall be an English Lawyer of at least ten years standing and be appointed by the LCIA.  The Parties hereto hereby submit to the exclusive jurisdiction of the LCIA.  Any judgment shall be final and binding upon the Parties as to the subject matter decided.

21.3   Without prejudice to any other mode of service, the Obligors:

(a)   Will appoint an agent within 60 days as their agent for service of process in relation to any proceedings before the English courts in connection with the Finance Documents to which it is a party and agrees to deliver a notice of acceptance of such appointment to the Lender;

(b)   agree to maintain such an agent for service of process in England for so long as any amount is outstanding under the Finance Documents;

(c)   agree that failure by a process agent to notify the Obligor of the process will not invalidate the proceedings concerned;

(d)   consent to the service of process relating to any such proceedings by prepaid posting of a copy of the process to its address for the time being applying under Clause 18 (Notices); and

(e)   agree that if the appointment of any person mentioned in this Clause 21.3 ceases to be effective, the relevant Obligor(s) shall immediately:

(1)   appoint a further person in England to accept service of process on its behalf in England and;

(2)   notify the Lender of such appointment and, failing such appointment and notification within 15 days, the Lender is entitled to appoint such a person by notice to the Obligor.

**YIH1/42**

This Agreement has been entered into on the date stated at the beginning of this Agreement.

**East Guardian SPC, on behalf of Asset and Trade Finance Fund SP**

By: _____

Name:        Mr. Erik Wigertz

Title:        Director

**North Sea Biodiesel**

**as First Borrower**

By: _____

Name:

Title:

**Einer Energy SARL**
**as Second Borrower**

By: _____                    By: ___ G. Z. DE KEEUS

Name: **Constantin Lutsenko**                    Name:

Title:    Manager Cat. "A"                        Title:    DIRECTOR

**Arie Mazur**

**as Guarantor**

By: _____

Name:  Mr Arie Mazur

**Constantin Lutsenko**

**as Guarantor**

By: _____

Name:  Mr. Constantin Lutsenko

document number: LN74104.0004-EU-14019361/2        18

**YIH1/43**

This Agreement has been entered into on the date stated at the beginning of this Agreement.

Esol Guardian SPC, on behalf of Asset and Trade Finance Fund SP

By: _____

Name:        Mr. Erik Woortz

Title:         Director

North Sea Biodiesel

as First Borrower

By: _____

Name:    MARKO VAHTRA

Title:    C.E.O

Elner Energy SARL
as Second Borrower

By: _____          By: _____

Name:  Constantin Lutsenko            Name:

Title:    Manager Cat. "A"            Title:

Arie Mazur

as Guarantor

By: _____

Name:  Mr Arie Mazur

Constantin Lutsenko

as Guarantor

By: _____

Name:  Mr. Constantin Lutsenko

document number: LN74104.0004-EU-14019361/2       18

LCIA Arbitration Number 142794

IN THE MATTER OF THE ARBITRATION ACT 1996

BETWEEN:

## EAST GUARDIAN SPC

Claimant

-and-

## ARIE MAZUR

First Respondent

## CONSTANTIN LUTSENKO

Second Respondent

## EINER ENERGY SARL

Third Respondent

## NORTH SEA BIODIESEL A/S

Fourth Respondent

---

## FINAL AWARD

---

**YIH1/45**

## I.    INTRODUCTION

1.  The Claimant in this arbitration is East Guardian SPC ("EG"), a segregated portfolio company established under the laws of the Cayman Islands with a registered address and headquarters at c/o Maples Corporates Services Ltd., PO Box 309, Ugland House, South Church Street, Grand Cayman KY1-1104, Cayman Islands.

2.  The loans giving rise to the claim ("the EG Loans") were issued by a segregated portfolio managed by EG called the East Guardian Asset and Trade Finance Fund Segregated Portfolio (formerly the East Guardian Real Property Segregated Portfolio), albeit EG itself was a party to the EG Loans.

3.  The Claimant's legal representatives, at all times and for all purposes material to these arbitral proceedings, have been and are Asserson Law Offices, at 38 Wigmore Street, London W1U 2RU, and their Counsel is and has been Justin Higgo, of Serle Court Chambers.

4.  The Respondents in this arbitration are as follows:

    a.  Arie Mazur, the First Respondent, is a Canadian national, a beneficial owner of shares in the Third Respondent, indirectly a beneficial owner of the Fourth Respondent, and the business partner of the Second Respondent.

    b.  Constantin Lutsenko, the Second Respondent, is a national of the United States of America, currently resident in the Russian Federation, a beneficial owner of shares in the Third Respondent, indirectly a beneficial owner of the Fourth Respondent, and the business partner of the First Respondent.

    c.  Einer Energy SARL, the Third Respondent, is a Luxembourg company with registration number B154463 with its registered address at 1B Heienhaff, L-1736, Senningerberg, Luxembourg.

    d.  North Sea Biodiesel A/S, the Fourth Respondent, is a Norwegian private limited company, registered with the Norwegian Ministry of Enterprises under

**YIH1/46**

registration number 990 154 848 with its registered office at Oraveien 2, 1630 Gamle Fredrikstad, Norway. The Fourth Respondent was formerly known as Oniol AS. At all material times the Fourth Respondent was wholly owned by the Third Respondent.

5. The legal representatives of the Respondents in relation to these arbitral proceedings were at all material times and remain unknown. None of the Respondents has taken any part in these arbitral proceedings.

## II.   JURISDICTION

6. This Award in LCIA Arbitration No. 142794 is made in respect of claims ("the Claims") made by the Claimant in its Request for Arbitration, which Request was, in the circumstances set out below, permitted to be, and was in fact adopted as, the Claimant's Statement of Case. The Claims concern the Respondent's failure to pay sums owing to the Claimant, in breach of (i) a loan agreement dated 22 May 2013 between the Claimant and the Third Respondent (the "Second Loan Agreement"), (ii) an amended Second Loan Agreement dated 23 August 2013 (the "Increased Second Loan Agreement"), and (iii) a loan agreement dated 24 February 2014 (the "Third Loan Agreement"), pursuant to which loan agreements the Claimant had issued the EG Loans to the Third and Fourth Respondents between April 2013 and March 2014. The First and Second Respondents, parties to the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement, provided personal guarantees for each of the loans issued by the Claimant to the Third and Fourth Respondents.

7. Clause 21.1 of the Second Loan Agreement and the Increased Second Loan Agreement provided that:

> "This Agreement and all non-contractual obligations arising out of or in connection with it are governed by the laws of England and Wales without reference to its conflict of laws principles."

**YIH1/47**

8. Clause 22.2 of the Second Loan Agreement and the Increased Second Loan Agreement provided that:

> *"In the event of a dispute arising of or relating to this contract, including any question regarding its existence, validity or termination, the dispute shall be referred to an[d] finally resolved by arbitration under the LCIA rules, which rules are deemed to be incorporated by reference into this clause. The language to be used in the mediation and in the arbitration shall be English. The Arbitral Tribunal shall consist of one arbitrator who shall be an English Lawyer of at least ten years standing and be appointed by the LCIA. The Parties hereto hereby submit to the exclusive jurisdiction of the LCIA. Any judgment shall be final and binding upon the Parties as to the subject matter decided."*

9. Clauses 21.1 and 21.2 of the Third Loan Agreement were in identical terms to those set out in paragraphs 7 and 8 above.

## III.   PROCEDURAL HISTORY

10. The Claimant formally requested the commencement of this arbitration by its Request for Arbitration dated 23 September 2014 (the "Request").

11. In accordance with Article 1.1(g) of the Arbitration Rules of the London Court of International Arbitration 1998 (the "LCIA Rules"), copies of the Request, with the relevant exhibits, were sent to the Respondents and each of them by email, on 23 September 2014, and by courier, on 24 September 2014.

12. The Request was made at the same time as the Claimant's application dated 22 September 2014, for a worldwide freezing order ("WFO") against the First Respondent and the Second Respondent. A WFO was ordered by Mr Justice Morgan of the High Court against the First Respondent and the Second Respondent on 22 September 2014 and was sealed on 24 September 2014. On 30 October 2014, a final WFO was issued by Morgan J against the First Respondent and the Second Respondent.

**YIH1/48**

13. After the WFO was issued, the Claimant commenced proceedings in the Superior Court of Ontario to enforce the WFO against the First Respondent there and for related orders to assist the Claimant in locating and freezing the First Respondent's assets in Canada. By reason of those proceedings, the Canadian courts made the following orders on the Claimant's behalf and against the First Respondent:

    a. A Mareva injunction, dated 13 November 2014, restraining the First Respondent dissipating his assets up to the value of USD 23,000,000;

    b. An Order, dated 13 November 2014, appointing a personal Receiver to investigate and collect the First Respondent's assets;

    c. An Order, dated 15 December 2014, widening the powers of the Receiver to investigate and identify the First Respondent's assets; and

    d. An Anton Piller Order, dated 2 December 2014, allowing entry to and the search of the First Respondent's premises and the seizure of relevant evidence therefrom.

14. None of the Respondents filed any Response to the Claimant's Request within the time limit prescribed by Article 2 of the LCIA Rules, or at all.

15. By email dated 24 November 2014, after the LCIA had invited comment from the parties as the seat of the arbitration, the parties were informed that the LCIA Court had determined that, consistent with the terms of the Agreements between all the parties, the seat of the arbitration was London.

16. On 25 November 2014, the parties were notified by email of the appointment of the Tribunal, Mr Edwin Glasgow QC of 39 Essex Chambers, London. Mr Stephen Kosmin of 39 Essex Chambers, London, was appointed as Secretary to the Tribunal on 23 December 2014, with the consent of the Claimant and in the absence of dissent from any of the Respondents. Those appointments having been accepted, the Arbitral Tribunal was duly established in accordance with the provisions of the Agreements and the LCIA Rules as having jurisdiction in respect of the Claims.

**YIH1/49**

17. On 10 December 2014 the Claimant wrote to inform the LCIA that it elected to treat its Request as its Statement of Case, in accordance with Article 15 of the LCIA Rules.

18. On 23 December 2014, the Tribunal issued Directions, including confirmation of the fact that the Request for Arbitration had been duly served in accordance with the LCIA Rules, by the Claimant on the First, Second, Third and Fourth Respondents and directing that the Respondents deliver their Statement of Defence and any Statement of Cross Claim by 4pm on 7 January 2015.

19. On 23 October 2014, the deadline under Article 2.1 of the LCIA Rules for the Respondents to put in a Response to the Request expired.

20. By email dated 3 November 2014, the LCIA confirmed that it had not received a Response from any of the Respondents.

21. On 23 January 2015, no Response or Statement of Defence having been served by any of the Respondents, the Tribunal issued Procedural Order No.1 fixing directions through to the hearing and providing that such hearing was to take place in London on the first available date after 16 March 2015.

22. On 13 February 2015 and in accordance with Procedural Order No. 1, the Claimant submitted the evidence upon which it intended to rely at the hearing, namely a witness statement of Mr Yisroel Hiller and a witness statement of Mr Erik Wigertz, both statements being dated 13 February 2015.

23. On 3 March 2015, the Tribunal issued Procedural Order No. 2. Procedural Order No. 2 recorded, *inter alia,* that the Claimant had agreed to the Tribunal's request that it correspond with a Canadian lawyer who was known to have acted for the First Respondent in court proceedings in Canada, in order to see whether he was prepared to assist the Tribunal by accepting service on behalf of the First Respondent or by providing an address for service; however, the Claimant was informed prior to the hearing that the First Respondent's Canadian lawyer was no longer instructed by the First Respondent.

**YIH1/50**

## IV.    THE HEARING

24. On 14 April 2015, the hearing took place at the International Dispute Resolution Centre in London.

25. At the hearing, the Claimant was represented by Mr Justin Higgo.  None of the Respondents attended the hearing and none was represented at it.  It was, however, submitted on behalf of the Claimant that the Tribunal should take particular note of the following matters in relation to the WFO proceedings referred to at paragraph 12 above:

   (i)   The First and Second Respondents had been represented by the well known international law firm, Charles Russell (now Charles Russell Speechlys LLP) in the course of the WFO proceedings;

   (ii)  The WFO proceedings were issued and determined in the context of these arbitral proceedings also being extant at that time;

   (iii) While purporting to reserve their positions in respect of the jurisdiction of the English court in relation to those proceedings, and while denying that the Claimant was entitled to the relief sought (and ultimately granted) in those court proceedings, the evidence served on behalf of the First and Second Respondents in those proceedings had not sought to deny that any of the material loans had been made, or that the sums claimed by way of debt and interest were not due, or that the guarantees had not been given.

26. Witness statements dated 13 February 2015 were provided by Mr Yisroel Hiller and by Mr Erik Wigertz.  Both gave oral evidence.

27. The Claimant (i) submitted that the Tribunal should not take any account of the facts and matters set out in paragraphs 85 to 120 of the First Affidavit of Mr Wigertz (or of the documents therein referred to) which formed part of the exhibit to Mr Wigertz' witness statement in these proceedings and that such facts and matters, which related to a telephone conversation which had taken place between the parties on 29 May 2014, should not be admitted in evidence; and (ii) informed the Tribunal that the Claimant placed no reliance on the contents of any of the communications which the First and

**YIH1/51**

Second Respondents, in their affidavits in the WFO proceedings, had asserted to have attracted privilege.  The Tribunal acted accordingly and did as requested.

28. Oral opening and closing statements were made on behalf of the Claimant by Mr Justin Higgo.

29. The proceedings were transcribed.

30. The hearing was adjourned by the Tribunal on 14 April 2015 to permit the Claimant the opportunity to place a schedule before the Tribunal of the costs and expenses that it had incurred in the arbitration and, if so advised, to summarise in writing its closing submissions.

31. Supplemental written closing submissions were filed by the counsel for the Claimant by email on 17 April 2015, together with a schedule of costs and expenses.

V.    SUBMISSIONS AND EVIDENCE

a)  Background Facts

32. In view of the failure of the Respondents to attend or otherwise participate in this arbitration, the witness evidence of Mr Erik Wigertz and Mr Yisroel Hiller was not formally the subject of challenge.  The Tribunal accordingly questioned both Mr Erik Wigertz and Mr Yisroel Hiller in the course of the hearing in order to elucidate, clarify and test their evidence.  By reason of their responses to such questions and their evidence more generally, the Tribunal found both the witnesses' evidence to be clear, credible, careful and accurate.  Accordingly, those witnesses' evidence is adopted in this Award, save for the facts and matters referred to at paragraph 27 above.

33. The background facts are summarised below.

34. Between April 2013 and March 2014, the Claimant made a number of loans to the Third and Fourth Respondents, as set out in the table below.  The First Loan Agreement and the Increased Third Loan Agreements are included by way of background

**YIH1/52**

notwithstanding the fact that they are not constitutive of the EG Loans giving rise to the instant Claims.

| | Date | Repayment Date | Borrower | Guarantor | Amount (USD) |
|---|---|---|---|---|---|
| First Loan Agreement | 03-04-13 | 17-05-13 | Third Respondent | Great Lakes Biodiesel Inc. | 4,500,000 Repaid in full on 22-05.13 |
| Second Loan Agreement | 22-05-13 | 20-11-13 | Third Respondent | (1) First Respondent (2) Second Respondent | 10,500,000 |
| Increased Second Loan Agreement | 23-08-13 | 21-08-14 | (1) Third Respondent (2) Fourth Respondent | (1) First Respondent (2) Second Respondent | Increase of 7 000,000 Total: 17,500,000 |
| Third Loan Agreement | 25-02-14 | 23-02-15 | (1) Fourth Respondent (2) Third Respondent | (1) First Respondent (2) Second Respondent | 3,500,000 |
| Increased Third Loan Agreement | 27-03-14 | 23-02-15 | (1) Fourth Respondent (2) Third Respondent | (1) First Respondent (2) Second Respondent | Increase of 9,000,000 Repaid on 15-07-2014 Total: 12 500,000 |

35. Mr Wigertz confirmed in his oral evidence, in response to questioning from the Tribunal, that his signature, and what he recognised as the signatures of the First and Second

**YIH1/53**

Respondents, appeared on the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement.

36. The Claimant made a loan of USD 10,500,000 to the Third Respondent on 22 May 2013 pursuant to the Second Loan Agreement. Copies of the wire transfer confirmations for this loan were provided.

37. The Claimant increased this loan to USD 17,500,000 by providing a further loan of USD 7,000,000 to the Third and Fourth Respondents on 23 August 2013 pursuant to the Increased Second Loan Agreement. Copies of the wire transfer confirmations for this loan were verified by Mr Wigertz and provided to, and admitted in evidence by, the Tribunal.

38. Pursuant to Clause 7.1 of the Second Loan Agreement and the Increased Second Loan Agreement, the loans were to be repaid by the designated repayment date specified therein as 21 August 2014. By Clause 3 of both the Second Loan Agreement and the Increased Loan Agreement, the Respondents undertook to pay the Claimant interest at the stipulated rate from the date when the sums became payable under the Second Loan Agreement and the Increased Second Loan Agreement until the date of the Award.

39. The First and Second Respondents signed the Second Loan Agreement and the Increased Second Loan Agreement as personal guarantors. The Recitals in the Second Loan Agreement and the Increased Second Loan Agreement defined the First and Second Respondents as "Guarantors." Further:

    a. Clause 7.1 of the Second Loan Agreement provided that:

       *"The Borrower shall, and the Guarantors shall ensure that the Borrower shall, repay the loan in full, together with all remaining interest accrued thereon and not paid on any previous Interest Payment Date, on 20 November 2013 (the "Repayment Date")."*

**YIH1/54**

b.  Similarly, Clause 7.1 of the Increased Second Loan Agreement provided that:

*"The Borrower shall, and the Guarantors shall ensure that the Borrower shall, repay the loan in full, together with all remaining interest accrued thereon and not paid on any previous Interest Payment Date, on 21 August 2014 (the "Repayment Date")."*

40. The Claimant provided a loan of USD 3,500,000 to the Third and Fourth Respondents on 25 February 2014, pursuant to the Third Loan Agreement. Copies of the wire transfer confirmations for this loan were verified by Mr Wigertz and provided to, and admitted in evidence by, the Tribunal.

41. Pursuant to Clause 7.1 of the Third Loan Agreement, the loan was to be repaid by the designated repayment date specified therein as *"12 months from the date of this Agreement"*, being 23 February 2015.  By Clause 3 of the Third Loan Agreement, the Respondents undertook to pay the Claimant interest at the stipulated rate from the date when the sums became payable under the Third Loan Agreement until, in the events which have in act occurred, the date of this Award.

42. The Claimant increased this loan to USD 12,500,000 by providing a further loan of USD 9,000,000 on 27 March 2014 to the Third and Fourth Respondents pursuant to the Increased Third Loan Agreement. Copies of the wire transfer confirmations for this loan were verified by Mr Wigertz in evidence and provided to, and admitted as evidence by, the Tribunal.

43. The First and Second Respondents signed the Third Loan Agreement and the Increased Third Loan Agreement as personal guarantors. The Recitals in the Third Loan Agreement and the Increased Third Loan Agreement defined the First and Second Respondents as "Guarantors."  As in the Second Loan Agreement and the Increased Second Loan Agreement, Clause 7.1 of the Third Loan Agreement (which was not amended in the Increased Third Loan Agreement) provided that:

**YIH1/55**

*"The Borrower shall, and the Guarantors shall ensure that the Borrower shall, repay the loan in full, together with all remaining interest accrued thereon and not paid on any previous Interest Payment Date, on the date falling 12 months from the date of this agreement (the "Repayment Date")."*

44. The Third Loan Agreement further provided that under Clause 11.2, the Claimant was entitled to call in the loan early upon the occurrence of any *"Event of Default"*. In summary, so far as is material to the Claimant's pleaded Statement of Case, the *"Events of Default"* included:

   a. the failure to pay interest when due (Clause 11.1(a));

   b. the failure to ensure that representations or warranties provided to the Claimant were not misleading or incorrect in any material respect (Clause 11.1(c));

   c. the failure to pay any financial indebtedness of any obligor when due (Clause 11.1(d));

   d. the failure to provide accurate information about the borrowers' legal or financial condition to the Claimant (Clause 11.1(h)); or

   e. the failure by First and Second Respondents to comply with the undertaking they provided in clause 10.8 (Clause 11.1(k)).

45. On 15 July 2014, the Respondents repaid the capital sum of USD 9,000,000 under the Increased Third Loan Agreement. Copies of the wire transfer confirmations for this payment were verified by Mr Wigertz in his evidence and provided to and admitted as evidence by, the Tribunal.

46. On 21 August 2014, the Claimant called in the loan pursuant to the Third Loan Agreement, relying upon Clause 11.2 of the same.

**YIH1/56**

47. As set out in the table below, none of the Respondents has paid any of the sums due under the EG Loans, by the relevant Repayment Dates of the Second Loan Agreement, Increased Second Loan Agreement and/or the Third Loan Agreement, or at all:

| | Date of Loan Agreement | Date of Transfer | Sum Transferred by the Claimant (USD) | Date Sums Repaid to the Claimant in full |
|---|---|---|---|---|
| First Loan Agreement | 03-04-13 | 03-04-13 | 4,500,000 | 22-05-13 |
| Second Loan Agreement | 22-05-13 | 22-05-13 | 4,545,000 | n/a |
| | | 23-05-13 | 4,612,000 | |
| | | 17-07-13 | 1,343,000 | |
| Increased Second Loan Agreement | 23-08-13 | 23-08-13 | 7,000,000 | n/a |
| Third Loan Agreement | 24-02-14 | 25-02-14 | 3,500,000 | n/a |
| Increased Third Loan Agreement | 26-03-14 | 27-03-14 | 250,000 | 15-07-2014 |
| | | 27-03-14 | 8,750,000 | |

b) **Submissions as to liability**

48. The Claimant claims the outstanding capital of the EG Loans, amounting to USD 21,000,000 (see below as to sums sought as interest on the capital sums).

**YIH1/57**

49. The Claimant submitted that the Respondents had failed to pay sums due under the EG Loans, by the relevant Repayment Dates of the Second Loan Agreement and the Increased Second Loan Agreement, namely 21 August 2014, or at all.

50. Relying upon the witness statements of Mr Erik Wigertz and Mr Yisroel Hiller, the Claimant had also submitted in the Request that certain *"Events of Default"* under the Third Loan Agreement had occurred (including those under Clauses 11.1(a), 11.1(e), 11.1(h), and 11.1(k)), such that the USD 3,500,000 sum paid by the Claimant was due upon the Claimant calling in the loan and demanding repayment on 21 August 2014. In the light of the events which had occurred by the date of the hearing, the Claimant relied on the fact that the Respondents had failed to pay sums due under the EG Loans by the relevant Repayment Date of the Third Loan Agreement, namely 23 February 2015, or at all. The Claimant accordingly submitted that it was not necessary for the Tribunal to make any finding that the Claimant was additionally entitled to rely upon the default provisions in the Third Loan Agreement.

c) **Submissions as to interest**

51. For the purposes of these arbitral proceedings, the Claimant claims interest under the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement at only the contractual rate provided for by Clause 3 of the same (as distinct from the default rate) and only up until the date of the hearing and does not seek an award of interest at any higher rate or for any period extending beyond the date of the hearing. The Claimant submitted that the rate sought at the hearing was without prejudice to any entitlement to an award of interest at any higher rate or for any period extending beyond the date of the hearing; rather, it was a consequence of the Respondents not being represented at the hearing and the Claimant not wanting to take a point that had not been argued to the contrary by the Respondents. The amounts of interest claimed, and the basis of calculation in accordance with Clause 3, up to the date of the hearing are set out in the table below:

**YIH1/58**

| Period End | Days in period | Date of payment | Interest Accrued @ 20% | Interest paid |
|---|---|---|---|---|
| 22/09/2013 | 31 | 20/09/2013 | 301,389 | 301,389 |
| 22/10/2013 | 30 | 22/10/2013 | 291,667 | 291,667 |
| 22/11/2013 | 31 | 25/11/2013 | 301,389 | 301,389 |
| 22/12/2013 | 30 | 15/02/2014 | 291,667 | 291,667 |
| 22/01/2014 | 31 | 30/01/2014 | 301,389 | 301,389 |
| 22/02/2014 | 31 | 24/02/2014 | 301,389 | 301,389 |
| 22/03/2014 | 28 | 20/03/2014 | 272,222 | 272,222 |
| 22/04/2014 | 31 | 07/05/2014 | 301,389 | 301,389 |
| 22/05/2014 | 30 | not made | 291,667 | 0 |
| 22/06/2014 | 31 | not made | 301,389 | 0 |
| 22/07/2014 | 30 | not made | 291,667 | 0 |
| 22/08/2014 | 31 | not made | 301,389 | 0 |
| 22/09/2014 | 31 | not made | 301,389 | 0 |
| 22/10/2014 | 30 | not made | 291,667 | 0 |
| 22/11/2014 | 31 | not made | 301,389 | 0 |
| 22/12/2014 | 30 | not made | 291,667 | 0 |
| 22/01/2015 | 31 | not made | 301,389 | 0 |
| 22/02/2015 | 31 | not made | 301,389 | 0 |
| 22/03/2015 | 28 | not made | 272,222 | 0 |
| 14/04/2015 | 23 | not made | 223,611 | 0 |

| Period End | Days in period | Date of payment | Interest Accrued @ 15% | Interest paid |
|---|---|---|---|---|
| 22/03/2014 | 28 | 21/03/2014 | 37,917 | 37,917 |
| 22/04/2014 | 31 | 29/04/2014 | 45,208 | 45,208 |
| 22/05/2014 | 30 | not made | 43,750 | 0 |
| 22/06/2014 | 31 | not made | 45,208 | 0 |
| 22/07/2014 | 30 | not made | 43,750 | 88,958 |
| 22/08/2014 | 31 | not made | 45,208 | 0 |
| 22/09/2014 | 31 | not made | 45,208 | 0 |
| 22/10/2014 | 30 | not made | 43,750 | 0 |
| 22/11/2014 | 31 | not made | 45,208 | 0 |
| 22/12/2014 | 30 | not made | 43,750 | 0 |
| 22/01/2015 | 31 | not made | 45,208 | 0 |
| 22/02/2015 | 31 | not made | 45,208 | 0 |
| 22/03/2015 | 28 | not made | 37,917 | 0 |
| 14/04/2015 | 23 | not made | 33,542 | 0 |

**YIH1/59**

| Accrued Interest on Interest unpaid @ 20% | Total Accrued @ 20% |
|---|---|
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 291,667 |
| 5,023 | 598,079 |
| 9,884 | 899,630 |
| 15,237 | 1,216,256 |
| 20,427 | 1,538,072 |
| 24,792 | 1,854,530 |
| 30,641 | 2,186,561 |
| 34,676 | 2,512,903 |
| 40,855 | 2,855,147 |
| 46,046 | 3,202,582 |
| 46,278 | 3,521,082 |
| 41,492 | **3,786,185** |

| Accrued Interest on Interest unpaid @ 15% | Total Accrued @ 15% |
|---|---|
| 0 | 0 |
| 0 | 0 |
| 0 | 43,750 |
| 565 | 89,523 |
| 1,112 | 45,427 |
| 0 | 90,635 |
| 584 | 136,427 |
| 1,130 | 181,307 |
| 1,733 | 228,248 |
| 2,242 | 274,240 |
| 2,882 | 322,330 |
| 3,466 | 371,004 |
| 3,658 | 412,579 |
| 3,368 | **449,489** |

**4,235,674**

YIH1/60

52. The Claimant accordingly sought:

   a. repayment by each of the Third and Fourth Respondents under the EG Loan Agreements in an amount of USD 25,235,674 (comprising USD 21,000,000 of capital and USD 4,235,674 of unpaid interest to 14 April 2015);

   b. damages in an equivalent amount against each of the First and Second Respondents under their guarantees; and

   c. Costs and expenses of the arbitration.

## VI.   FINDINGS ON LIABILITY

53. In respect of the Third and Fourth Respondents' liability, the Tribunal finds that:

   a. the Claimant paid sums totalling USD 21,000,000 to the Third and Fourth Respondents pursuant to the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement;

   b. the Third and Fourth Respondents failed to repay those sums on or before the designated Repayment Dates in the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement;

   c. by reason of the aforesaid, the unpaid sums, being both capital and interest, are liable to be repaid immediately by Third and Fourth Respondents.

54. With respect to the First and Second Respondents' guarantees, the Tribunal adopts the reasoning of Lord Diplock in *Lep Air Services v Rolloswin Ltd* [1973] AC 331 at 348H to 394A:

   *"It follows from the legal nature of the obligation of the guarantor to which a contract of guarantee gives rise that it is not an obligation himself to pay a sum of money to the creditor, but an obligation to see to it that another person, the debtor, does something; and that the creditors' remedy for the guarantor's failure to perform it lies in damages for breach of contract only...The legal consequence of this is that whenever the debtor has failed voluntarily to perform an obligation which is the subject of the guarantee the creditor can recover from the guarantor as damages for breach of his contract of guarantee whatever the*

17

**YIH1/61**

*sum the creditor could have recovered from the debtor himself as a consequence of that failure. The debtor's liability to the creditor is also the measure of the guarantors.*

55. In accordance with that ratio decidendi in *Lep Air Services v Rolloswin Ltd*, a "see to it" guarantee in the form of Clause 7.1 of the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement, provides the Claimant with a claim in damages against the First and Second Respondents.

56. Accordingly, in respect of the First and Second Respondents' liability, the Tribunal finds that:

    a.  the First and Second Respondents were parties to the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement. Clause 7.1. of each of the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement was accordingly binding on the First and Second Respondents;

    b.  clause 7.1 of each of the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement was a contractual guarantee, having the effect that the First and Second Respondents were each personally liable to ensure that the Third and Fourth Respondents repaid the EG Loans in full, together with all remaining interest accrued thereon and not paid on any previous Interest Payment Date (as defined in the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement), on the Repayment Dates (as defined in the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement);

    c.  the First and Second Respondents failed to repay the EG Loans on or before the designated Repayment Dates in the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement. Accordingly, the First and Second Respondents' personal liability to the Claimant under their guarantees is triggered;

**YIH1/62**

    d.  by reason of the aforesaid, the unpaid sums, being both capital and interest, are due and owing to the Claimant from the First and Second Respondents.

57. In the event, the Tribunal accepts the Claimant's submission that it is not necessary for any finding to be made as to whether, or not, certain "*Events of Default*" under the Third Loan Agreement had occurred (including those under Clauses 11.1(a), 11.1(e), 11.1(h), and 11.1(k)), such that the USD 3,500,000 sum paid by the Claimant was due upon the Claimant calling in the loan and demanding repayment on 21 August 2014.  As set out in paragraph 56 above, the Tribunal is satisfied that  the Respondents failed to pay sums due under the EG Loans in advance of the relevant Repayment Date of the Third Loan Agreement, namely 23 February 2015, or at all, and are liable in respect of the USD 3,500,000 sum accordingly.  However, and for avoidance of any doubt, the Tribunal was also persuaded by the written evidence before it that "*Events of Default*" under the Third Loan Agreement had occurred.

## VII.    FINDINGS ON QUANTUM OF CAPITAL SUM

58. In accordance with the Tribunal's findings on liability above, it finds that the Claimant is entitled to repayment by each of the Third and Fourth Respondents of the capital sums owing under the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement, comprising USD 21,000,000.

59. The Tribunal further finds that the Claimant is entitled to damages against each of the First and Second Respondents under their guarantees in respect of the capital sums owing under the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement, comprising USD 21,000,000.  For the avoidance of doubt, in the event that any part of that sum shall have been paid by the Third and/or Fourth Respondent, the Claimant shall not be entitled to recover that amount as damages or at all from the First and/or Second Respondent.

**YIH1/63**

## VIII.   FINDINGS ON CONTRACTUAL INTEREST

60. The Tribunal also finds that the Third and Fourth Respondents are liable to pay contractual interest pursuant to Clause 3 of the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement, and that they have not paid such contractual interest by the designated Repayments Dates or at all.  The Tribunal can find no justification in law for awarding interest on any basis or at any rate other than as provided for under the terms of the Agreements.  In the event, the Claimant in this arbitration seeks only contractual interest up until the date of the hearing and did not seek an award of interest at any higher rate or for any period extending beyond the date of the award. The Tribunal accordingly finds that the Third and Fourth Respondents are liable to pay the Claimant contractual interest of USD 4,235,674, being the total of unpaid contractual interest up until 14 April 2015, on which date the hearing occurred.

61. As stated above, the Tribunal finds that the First and Second Respondents' guarantees in the Second Loan Agreement, the Increased Second Loan Agreement and the Third Loan Agreement give rise to the First and Second Respondents' personal liability to the Claimant in respect of the interest as claimed on the EG Loans.  Accordingly, the First and Second Respondents are liable to pay the Claimant damages in respect of the remaining contractual interest of USD 4,235,674, being the total of unpaid contractual interest up until 14 April 2015, on which date the hearing occurred. Again for the avoidance of doubt, in the event that any part of that sum shall have been paid by the Third and/or Fourth Respondent, the Claimant shall not be entitled to recover that amount as damages or at all from the First and/or Second Respondent.

## IX.   COSTS

62. The Claimant seeks its costs and expenses of the arbitration in the total sum of £123,876.77. Those costs and expenses comprise:
    a. the costs of the arbitration: £36,750.00
    b. solicitors' fees : £50,093.17
    c. counsel's fees: £32,000.00; and
    d. other incidental expenses: £5,033.60.

**YIH1/64**

63. The Claimant expressly noted that the costs and expenses sought do not include the additional costs incurred ancillary to the arbitration claim in the injunction proceedings, which, by paragraph 11 of the WFO of Mr Justice Morgan on 30 October 2014, provided that the costs of that application be reserved to the further order of the Court.

64. In view of the findings set out above with respect to liability and quantum, and there being no grounds for departing from the principle set out in Article 28.4 of the LCIA Rules that the Tribunal's order as to costs should reflect the parties relative success, it follows that the Respondents are liable to pay the Claimant's costs of and occasioned by this arbitration.

65. Upon consideration of the Claimant's Schedule of Costs, and in accordance with Article 28.3, the Tribunal finds the Claimant's legal (and other) costs and expenses sought (outlined at sub-paragraphs 62.b. to 62.d. above) to be reasonable and properly claimed, save for the following heads of costs and expenses which the Tribunal has deducted from the sum claimed:

    a. Solicitors' fees of Mr Trevor Asserson, in the sum of £1,218.75, on account of the Claimant having failed to establish to my satisfaction Mr Asserson's involvement in the arbitration and the necessity and reasonableness of the same.

    b. Incidental expenses in respect of "taxi and dinner", in the sum of £27.28, on account of the Claimant having failed to establish to my satisfaction the necessity and reasonableness of the same.

Accordingly the Tribunal considers the Claimant's legal and others costs (other than the costs of the arbitration) which are reasonable and properly claimed amount to £85,880.74.

66. The Tribunal notes that the costs awarded do not include the additional costs incurred ancillary to the arbitration claim in the injunction proceedings, which, by paragraph 11 of the WFO of Mr Justice Morgan on 30 October 2014, provided that the costs of that application be reserved to the further order of the Court.

**YIH1/65**

67. The total costs of the arbitration (other than the legal and other costs incurred by the Claimant itself), have been determined by the LCIA Court, pursuant to Article 28.1 of the applicable (1998) LCIA Rules to be as follows :

| | |
|---|---|
| Registration fee | £1,750.00 |
| LCIA's administrative charges | £9,741.73 |
| Tribunal's fees | £16,105.00 |
| Secretary's fees | £2,260.002 |
| Total costs of arbitration | £29,856.73 |

68. The above costs have been paid entirely by the Claimant and exceed the deposits lodged with the LCIA. Accordingly, the Claimant is therefore entitled to recover from the Respondents the total costs of the arbitration (£29, 856.73).

69. Article 28.2 of the LCIA Rules provides that unless the parties agree otherwise in writing the Tribunal shall determine the proportions in which the parties shall bear all or any part of the arbitration costs. Article 28.4 of the LCIA Rules provides that unless the parties have agreed otherwise in writing the Tribunal shall make its orders on both arbitration and legal costs on the general principle that costs should reflect the parties' relative success and failure in the arbitration except where it appears to the Tribunal that in the particular circumstances the general approach would be inappropriate. In this case the Claimant had succeeded on all of its claims against the 1st and 2nd Respondents, and effectively all of its claims against the 3rd and 4th Respondents, and the Tribunal considers, taking into account all of the matters to which it has referred in this award, that the Respondents and each of them shall pay to the Claimant all of the costs which the Claimant has funded.

70. Accordingly, the Respondents and each of them are liable to pay the Claimant's costs and expenses of the arbitration, assessed in the sum of £85,880.74 by way of the Claimant's legal and other costs and £29,856.73 by way of the costs of the arbitration. Again for the avoidance of doubt, in the event that any part of that sum shall have been paid by the Third and/or Fourth Respondent, the Claimant shall not be entitled to recover that amount from the First and/or Second Respondent.

**YIH1/66**

X.     **AWARD**

71. For the reasons set out above the Tribunal makes the following orders:

   a.  The Third and Fourth Respondents shall pay to the Claimant the sum of USD
       21,000,000 owing under the Second Loan Agreement, the Increased Second Loan
       Agreement and the Third Loan Agreement;

   b.  The First and Second Respondents shall pay the sum of USD 21,000,000 by way
       of damages pursuant to their guarantees in respect of the capital sums owing
       under the Second Loan Agreement, the Increased Second Loan Agreement and
       the Third Loan Agreement;

   c.  The Third and Fourth Respondents shall pay to the Claimant the sum of USD
       4,235,674 by way of interest pursuant to pursuant to Clause 3 of the Second Loan
       Agreement, the Increased Second Loan Agreement and the Third Loan
       Agreement;

   d.  The First and Second Respondents shall pay to the Claimant the sum of  USD
       4,235,674 by way of damages pursuant to their guarantees in respect of the
       interest owing under the Second Loan Agreement, the Increased Second Loan
       Agreement and the Third Loan Agreement;

   e.  The Respondents and each of them shall pay the sum of £85,880.74 by way of the
       Claimant's legal and other costs and £29,856.73 by way of the costs of the
       arbitration.

**YIH1/67**

EDWIN GLASGOW QC

Sole Arbitrator

Dated: 30& April 2015

Seat of the arbitration: London

**YIH1/68**

EXHIBIT "D"

**\*\*FREEZING INJUNCTION \*\***

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**Before the Honourable Mr Justice Morgan**
**30 October 2014**
**And**
<u>**IN THE MATTER OF THE ARBITRATION ACT 1996**</u>
<u>**IN THE MATTER OF AN INTENDED ARBITRATION CLAIM**</u>



**B E T W E E N:**

**EAST GUARDIAN SPC**

<u>**Applicant**</u>

**- and -**

**(1) ARIE MAZUR**
**(2) CONSTANTIN LUTSENKO**

<u>**Respondents**</u>

**PENAL NOTICE**

IF YOU **ARIE MAZUR** AND IF YOU **CONSTANTIN LUTSENKO** DISOBEY THIS ORDER YOU MAY BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE YOUR ASSETS SEIZED.

ANY OTHER PERSON WHO KNOWS OF THIS ORDER AND DOES ANYTHING WHICH HELPS OR PERMITS THE RESPONDENT TO BREACH THE TERMS OF THIS ORDER MAY ALSO BE HELD TO BE IN CONTEMPT OF COURT AND MAY BE IMPRISONED, FINED OR HAVE THEIR ASSETS SEIZED.

**THIS ORDER**

1.    This is a Freezing Injunction made against Arie Mazur ("the First Respondent") and Constantin Lutsenko ("the Second Respondent") on 30 October 2014 by Mr Justice Morgan on the application of East Guardian SPC ('the Applicant'). The Judge read the Affidavit(s) listed in Schedule A and accepted the undertakings set out in Schedule B at the end of this Order.

2.    This order was made at a hearing on notice to the Respondent. The <u>First</u> Respondent has a right to apply to the court to vary or discharge the order – see paragraph 12 below.

3.    If there is more than one Respondent-

   (a)    unless otherwise stated, references in this order to "the Respondent" mean both or all of them; and

   (b)    this order is effective against any Respondent on whom it is served or who is given notice of it.

**FREEZING INJUNCTION**

4.   Until seven days after the due date for collection of any final award on the merits or further order of the Court –

  (1)   remove from England and Wales any of his assets which are in England and Wales up to     the value of USD 23,000,000; or

  (2)   in any way dispose of, deal with or diminish the value of any of his assets whether they are in or outside England and Wales up to the same value.

5.   Paragraph 4 applies to all the Respondent's assets whether or not they are in his own name and whether they are solely or jointly owned. For the purpose of this order the Respondent's assets include any asset which he has the power, directly or indirectly, to dispose of or deal with as if it were his own. The Respondent is to be regarded as having such power if a third party holds or controls the asset in accordance with his direct or indirect instructions.

6.   This prohibition includes the following assets in particular –

  (a)   Any money standing to the credit of any bank account, including any accounts held by the First Respondent or the Second Respondent;

  (b)   Any interest under any trust or similar entity including any interest which can arise by virtue of the exercise of any power of appointment, discretion or otherwise howsoever;

  (c)   such interest as the First Respondent may have in Reneos Ltd, a company registered in the United Kingdom;

  (d)   such interest as the First Respondent may have in a property investment company Global Horizons Group, SPV's established in Florida, USA GHG042 LLC, GHG042A LLC, and Banyan Villas LLC, and any properties acquired or held by those companies or SPV's;

  (e)   such interest as the First Respondent may have in a Cypriot company called Orense Investments Ltd;

  (f)   such interest as the First Respondent may have in a BVI-registered company called Praveen Investing Ltd;

  (g)   such interest as the Second Respondent may have in Sovereign Sale & Commerce Ltd;

  (h)   such interest as the Second Respondent may have in Reneos Ltd, a company registered in the United Kingdom;

(i)   such interest as the Second Respondent may have in NK Prospekt LLC, a company registered in SARATOVSKOY OBLASTI;

(j)   the net sale money of the Second Respondent's property known as 101 Warren Street, Unit 590, New York, NY 10007;

(k)   the Second Respondent's property known as 7123 Fisher Island Drive, Unit 7123, Miami Beach, FL 33109 or the net sale money after payment of any mortgages if it has been sold;

(l)   the Second Respondent's property known as 1-iy Smolenskiy pereulok, d. 17, Kv. 75 or the net sale money after payment of any mortgages if it has been sold;

(m)   the Second Respondent's property known as Ul. Nikolayeva, d. 4, kv. 9 or the net sale money after payment of any mortgages if it has been sold.

(n)   The Second Respondent's properties known as Building Liter A and Building Liter B, 54b, Zhukovka village, Moscow Region, Russia.

7.   (1)   If the total value free of charges or other securities ('unencumbered value') of the Respondent's assets in England and Wales exceeds USD 23,000,000 the Respondent may remove any of those assets from England and Wales or may dispose of or deal with them so long as the total unencumbered value of the Respondent's assets still in England and Wales remains above USD 23,000,000.

(2)   If the total unencumbered value of the Respondent's assets in England and Wales does not exceed USD 23,000,000, the Respondent must not remove any of those assets from England and Wales and must not dispose of or deal with any of them. If the Respondent has other assets outside England and Wales, he may dispose of or deal with those assets outside England and Wales so long as the total unencumbered value of all his assets whether in or outside England and Wales remains above USD 23,000,000.

**ASSET DISCLOSURE**

8.   The First Respondent shall within 10 working days of service of this Order swear and serve an affidavit, enclosing all documents in his control, and providing a full explanation to the best of his information and belief as to:

(a)   the amount of his present living expenses;

(b)   the account or accounts from which he has discharged his living expenses for the past 12 months (enclosing bank statements for the account(s));

(c)   the source of the funds which he has used to discharge his living expenses in the past 12 months;

3

(d)    the source of the funds from which he intends to discharge living and legal expenses in these proceedings and in the proceedings in Canada from this point forwards;

(e)    the precise nature of his interest in Praveen Investment Ltd. prior to October 2013, including:

      i.    details of the destination of the proceeds of sale of any properties owned by these companies and disposed of within the last 2 years (enclosing all bank statements in his control evidencing the same);

      ii.    the precise nature of its interest in Global Horizons Group and in any SPVs holding property in Florida and Banyan Villas as set out in paragraph 7(d) of the Order and the precise whereabouts and/or destination of the proceeds of sale of the properties owned by these companies and disposed of within the last 2 years (enclosing all bank statements in his control evidencing the same);

      iii.    the terms of the alleged sale of his interest to Mr Timofeev referred to in his second affidavit dated 16 October 2014;

(f)    the whereabouts and/or destination of the proceeds of the sale of 32 Stratheden Road (enclosing all bank statements in his control evidencing the same);

(g)    the Order referred to in paragraph 144 of his second affidavit dated 16 October 2014 relating to his divorce settlement with Eva Mazur

(h)    any interest that he has had or has under a trust or similar entity, including any interest that can arise by virtue of an exercise of any power of appointment, discretion or otherwise;

(i)    details of any bank accounts he has held in his personal name in the past 2 years or which are operated in accordance with his direct and/or indirect instructions.

9.    The Second Respondent shall within 10 working days of service of this Order swear and serve an affidavit:

(a)    exhibiting the documents in his control, if any, to support the statements in paragraph 73 of his second affidavit dated 16 October 2014 that he has no ownership interest in Sovereign Sales & Commerce Ltd. and that his mother is the ultimate beneficial owner of the company;

(b)    exhibiting any documents in his control which identify the ultimate beneficial owner of Sovereign Sales & Commerce Ltd. from 1 April 2013 to date, including any documents which identify the persons to whom the company has paid dividends or made distributions;

(c)    exhibiting any documents in his control which identify the interest of Sovereign Sales & Commerce Ltd. in Reneos Ltd from 1 April 2013 to date;

(d)    providing a genuine estimate of the value of the interest of Sovereign Sales & Commerce in Reneos Ltd.;

(e)  enclosing all documents in his control, and providing a full explanation to the best of his information and belief as to:

    a.  the precise nature of his interest in the property known as 7123 Fisher Island Drive Unit 7123, Miami Beach, FL 33109 and the extent of the borrowings for which he is responsible that are secured against that property;

    b.  the whereabouts and/or destination of the net proceeds of the sale of 101 Warren Street New York (enclosing all bank statements in his control evidencing the same);

    c.  the identity of the beneficial owner of Shinx Worldwide Limited.

## EXCEPTIONS TO THIS ORDER

10.  (1)  This order does not prohibit the Respondent from spending $2000 a week on his ordinary living expenses and also a reasonable sum on legal advice and representation. But before spending any money the Respondent must tell the Applicant's legal representatives where the money is to come from.

    (2)  This order does not prohibit the Respondent from dealing with or disposing of any of his assets in the ordinary and proper course of buisness.

    (3)  The Respondent may agree with the Applicant's legal representatives that the above spending limits should be increased or that this order should be varied in any other respect, but any agreement must be in writing.

    (4)  The order will cease to have effect if the Respondent –

        (a)  provides security by paying the sum of USD 23,000,000 into court, to be held to the order of the court; or

        (b)  makes provision for security in that sum by another method agreed with the Applicant's legal representatives.

## COSTS

11.  The costs of this application shall be reserved to the further order of the Court.

## VARIATION OR DISCHARGE OF THIS ORDER

12.  The First Respondent shall be permitted apply to the court at any time to vary or discharge this order, for the avoidance of doubt, on any ground properly open to him and without the need to demonstrate a material change of circumstances since the date of this order but he must first inform the Applicant's solicitors. If any evidence is to be relied upon in support of the application, the substance of it must be communicated in writing to the Applicant's solicitors in advance.

13. Any third party served with or notified of this order may apply to the court at any time to vary or discharge this order (or so much of it as affects that person), but they must first inform the Applicant's solicitors. If any evidence is to be relied upon in support of the application, the substance of it must be communicated in writing to the Applicant's solicitors in advance.

## INTERPRETATION OF THIS ORDER

14. A Respondent who is an individual who is ordered not to do something must not do it himself or in any other way. He must not do it through others acting on his behalf or on his instructions or with his encouragement.

15. A Respondent which is not an individual which is ordered not to do something must not do it itself or by its directors, officers, partners, employees or agents or in any other way

## PARTIES OTHER THAN THE APPLICANT AND RESPONDENT

16. **Effect of this order**

   It is a contempt of court for any person notified of this order knowingly to assist in or permit a breach of this order. Any person doing so may be imprisoned, fined or have their assets seized.

17. **Set off by banks**

   This injunction does not prevent any bank from exercising any right of set off it may have in respect of any facility which it gave to the respondent before it was notified of this order

18. **Withdrawals by the Respondent**

   No bank need enquire as to the application or proposed application of any money withdrawn by the Respondent if the withdrawal appears to be permitted by this order.

19. **Persons outside England and Wales**

   (1) Except as provided in paragraph (2) below, the terms of this order do not affect or concern anyone outside the jurisdiction of this court.

   (2) The terms of this order will affect the following persons in a country or state outside the jurisdiction of this court –

   (a) the Respondent or his officer or agent appointed by power of attorney;

   (b) any person who-

       (i) is subject to the jurisdiction of this court;

    (ii)    has been given written notice of this order at his residence or place of business within the jurisdiction of this court; and

    (iii)    is able to prevent acts or omissions outside the jurisdiction of this court which constitute or assist in a breach of the terms of this order; and

    (c)any other person, only to the extent that this order is declared enforceable by or is enforced by a court in that country or state.

20.    **Assets located outside England and Wales**

Nothing in this order shall, in respect of assets located outside England and Wales, prevent any third party from complying with –

(1)    what it reasonably believes to be its obligations, contractual or otherwise, under the laws and obligations of the country or state in which those assets are situated or under the proper law of any contract between itself and the Respondent; and

(2)    any orders of the courts of that country or state, provided that reasonable notice of any application for such an order is given to the Applicant's solicitors.

**Service out of the jurisdiction**

21.    The Applicant has permission to serve this Order on the First Respondent out of the jurisdiction by (a) prepaid post to 50 Lawrence Crescent, Toronto, Ontario, Canada, M4N 1N2 and (b) by email at a@einerenergy.com and arie.mazur@gmail.com and on the Second Respondent out of the jurisdiction by (a) prepaid post to M. Novopeskovski 8-36, Moscow 121099, Russian Federation and (b) email at constantin.lutsenko@gmail.com and constantin.lutsenko@einerenergy.com.

**COMMUNICATIONS WITH THE COURT**

All communications to the court about this order should be sent to  -

Fifth Floor, The Rolls Building, 7 Rolls Building, Fetter Lane, London EC4A 1NL quoting the case number. The telephone number is 020 7947 6322.

The offices are open between 10am and 4.30pm Monday to Friday.

**NAME AND ADDRESS OF APPLICANT'S SOLICITORS**

The Applicant's solicitors are:-

Asserson Law Offices
38 Wigmore Street

London W1U 2RU
Telephone: +44 0203 150 1300
Fax: +44 0203 150 0391


Out of hours:    Trevor Asserson by telephone +972 54 2001491
                           By email to trevor@asserson.co.uk

                   Yisroel Hiller  by telephone +972 54 9473808
                           By email to yisroel@asserson.co.uk

**SCHEDULE A**

**AFFIDAVITS**

The following affidavits and witness statements were considered by the Court—

1. 1st Affidavit of Erik Wigertz sworn on 22 September 2014.

2. 1st Affidavit of Arie Mazur sworn on 2 October 2014.

3. 1st Affidavit of Constantin Lutsenko sworn on 2 October 2014.

4. 2nd Affidavit of Arie Mazur sworn on 16 October 2014.

5. 2nd Affidavit of Constantin Lutsenko sworn on 16 October 2014.

6. 3rd Affidavit of Constantin Lutsenko sworn on 17 October 2014.

7. 2nd Affidavit of Erik Wigertz sworn on 24 October 2014.

8. Witness statement of Yisroel Hiller made on 24 October.

**SCHEDULE B**

**UNDERTAKINGS GIVEN TO THE COURT BY THE APPLICANT**

(1)   If the court later finds that this order has caused loss to the Respondent, and decides that the Respondent should be compensated for that loss, the Applicant will comply with any order the court may make.

(2)   The Applicant will serve this Order upon the Respondent as soon as practicable.

(3)   Anyone notified of this order will be given a copy of it by the Applicant's legal representatives

(4)   The Applicant will pay the reasonable costs of anyone other than the Respondent which have been incurred as a result of this order including the costs of finding out whether that person holds any of the Respondent's assets and if the court later finds that this order has caused such person loss, and decides that such person should be compensated for that loss, the Applicant will comply with any order the court may make.

(5)   If this order ceases to have effect (for example, if the Respondent provides security or the Applicant does not provide a bank guarantee as provided for above) the Applicant will immediately take all reasonable steps to inform in writing anyone to whom he has given notice of this order, or who he has reasonable grounds for supposing may act upon this order, that it has ceased to have effect.

(6)   The Applicant will not without the permission of the court use any information obtained as a result of this order for the purpose of any civil or criminal proceedings, either in England and Wales or in any other jurisdiction, other than this claim.

(7)   The Applicant will not without the permission of the court seek to enforce this order in any country outside England and Wales, or seek an order of a similar nature including orders conferring a charge or other security against the Respondent or the Respondent's assets, save for in Canada.

## NAME AND ADDRESS OF APPLICANT AND RESPONDENT
### Applicant:

**EASTGUARDIAN SPC**
c/o Maples Corporate Services Ltd., P.O. Box 309
Ugland House, South Church Street, Grand Cayman KY1-1104
Cayman Islands.


### Respondent:

**(1) ARIE MAZUR**
50 Lawrence Crescent, Toronto, Ontario, Canada, M4N 1N2
**(2) CONSTANTIN LUTSENKO**
M. Novopeskovski 8-36, Moscow 121099, Russian Federation

**\*\*FREEZING INJUNCTION \*\***

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**Before the Honourable Mr Justice Morgan**
**30 October 2014**
**And**
**IN THE MATTER OF THE ARBITRATION ACT 1996**
**IN THE MATTER OF AN INTENDED ARBITRATION CLAIM**

**B E T W E E N:**

**EAST GUARDIAN SPC**

**Applicant**

- and -

**(1) ARIE MAZUR**
**(2) CONSTANTIN LUTSENKO**

**Respondents**

**Asserson Law Offices**
38 Wigmore Street
London W1U 2RU
Telephone: +44 0203 150 1300
Fax: +44 0203 150 0391

Ref: Trevor Asserson